The SUPERIOR OIL COMPANY

v.

TRANSCO ENERGY COMPANY, et al.

Civ. A. No. 84–2138 L.

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

Feb. 11, 1985.
On Rehearing March 25, 1985.

Dan A. Spencer, Houston, Tex., for plaintiff.

Lawrence E. Donohoe, Jr., Edward C. Abell, Jr., Lafayette, La.; Alfred H. Ebert, Taylor M. Hicks, Houston, Tex., for defendants.

## MEMORANDUM RULING

DUHE, District Judge.

This matter involves an action by plaintiff, Superior Oil Company ("Superior"), against defendants Transcontinental Gas Pipe Line Corporation ("Pipe Line"), Transco Exploration Company ("TXC"), TXP Operating Company ("TXPO"), Transco Exploration Partners, Ltd. ("Partners"), and the Transco Energy Company ("TEC"), for injunctive relief and damages for alleged violations of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. 3301 et seq., and

the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq. In addition, through § 1349 of the Outer Continental Shelf Lands Act (OCS-LA), 43 U.S.C. § 1331 et seq., and the pendent jurisdiction of this Court, there are state law claims for damages and specific performance for the alleged breach of six contracts for the sale of natural gas from onshore and offshore fields of Louisiana and Texas. Presently before the Court are various motions: .

(1) A motion by the defendants to stay certain elements of this action and refer them to the Federal Energy Regulatory Commission (FERC);

(2) A motion by defendant Pipe Line to stay certain elements of this action pending arbitration;

(3) A motion by plaintiff for partial summary judgment;

Each of these will be considered in turn. As a preliminary inquiry, however, this Court will review its jurisdiction over this matter.

## JURISDICTION

■ Superior is seeking relief for the breach of six contracts for the sale of natural gas. Four of these contracts—the Eugene Island, West Cameron, Brazos and Vermilion—are for production fields on the Outer Continental Shelf (OCS) of Louisiana and Texas. The two remaining contracts—the Schwarz and Raccourci Island—are for onshore fields in Texas and Louisiana, respectively.

43 U.S.C. § 1349(b)(1) provides, in pertinent part, that:

(1) ... [T]he district courts of the United States shall have jurisdiction of cases and controversies arising *out of, or in connection with* (A) any operation conducted on the Outer Continental Shelf which involves exploration, development, or production of minerals, of the subsoil and seabed of the Outer Continental Shelf ... (emphasis added).

This Court has little difficulty in concluding that a contract for the sale of natural gas produced on the OCS arises out of and

is connected with the "exploration, development, or production of the minerals" of the Outer Continental Shelf. Hence this Court has original jurisdiction over the four OCS contacts at issue in this matter.

■ This Court has no such independent jurisdiction over plaintiff's claims arising out of the two onshore contracts. However, Superior has also alleged in its amended complaint that defendants' breach of these two contracts is part of a larger violation of the Federal antitrust laws, 15 U.S.C. § 1 and 2 (Sherman Act), and 15 U.S.C. § 14 (Clayton Act). Since Superior's state-law claims for breach of the two onshore contracts derive from a common nucleus of operative fact with its federal antitrust claims, this Court has pendent jurisdiction over the former. *Transource International, Inc., v. Trinity Industries, Inc.*, 725 F.2d 274 (5th Cir.1984). In the interests of judicial economy, this Court will exercise its discretionary pendent jurisdiction over the Schwarz and Raccourci Island contract claims in this matter.

## I. DEFENDANTS' MOTION TO STAY AND REFER TO FERC

The defendants have moved on the grounds of the "primary jurisdiction" doctrine that certain issues in this matter be stayed and referred to FERC. Those issues are:

(a) Whether any of the defendants have violated § 315 of NGPA, 15 U.S.C. § 3375, 18 C.F.R. § 277.101, by participating in short-term sales of new or high cost natural gas from the Outer Continental Shelf temporarily released from long-term contracts; and

(b) Whether maximum lawful price ceilings established under Title I of the NGPA would be exceeded if Superior were to receive "take or pay" payments for natural gas, whether or not such payments may be recouped or made up by Pipe Line.

In weighing this motion, this Court is guided by the principles enunciated by the Fifth Circuit in *Mississippi Power and Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412 (5th Cir.1976).

In *M P & L* the Court declared:

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* at 419.

However,

"there are a few general situations in which referral is often unwarranted ... when the agency's position is sufficiently clear or nontechnical or when the issue is peripheral to the main litigation, Court should be very reluctant to refer [citations omitted]. Finally, the Court must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible [citations omitted]." *Id.*

■ There are two questions that defendants seek to refer to FERC. The first—whether or not the short-term special marketing programs of defendants violate the NGPA of 1978—is peripheral to the central litigation, that is, the question of defendants' non-performance of their obligations. Hence, this Court has little difficulty in denying the defendants' motion as to this issue.

■ The second candidate for referral is the defendants' affirmative defense that the price ceilings of the NGPA of 1978 void their obligation to pay in the absence of taking, regardless of whether those payments are ultimately recoupable. Defendants contend that the technical nature of this question, and the fact that its resolution has industry-wide implications, augurs in favor of referral.

Various other district courts have wrestled with this question, and while at least one court has referred the issue to FERC—see *Post v. Perry Gas Transmission, Inc.*, 616 F.Supp. 1 (N.D.Tex.1983)—the weight of authority stands for the proposition that denial of the referral motion is proper. Cf. *Exxon Corp. v. Tenneco, Inc.* # 83–1640

(W.D.La.1983); *Southport Exploration, Inc. v. Producers Gas Co.,* # 83–C–550–BT (N.D.Okl.1983); *Sampson Resources v. Northern Natural Gas Company,* # 83–C–1214E (N.D.Okl.1982).

The FERC has taken the position that questions of this nature should not be referred to it. See the Amicus Curiae brief of the FERC, dated June 18, 1984, to the U.S. Court of Appeals for the Fifth Circuit, *Koch Industries, Inc. v. Columbia Gas Transmission Corp.,* # 83–990 (M.D.La. 1983). The FERC has failed to initiate proceedings on this question, even though some Courts have referred the question to it. Indeed, the FERC is unwilling to commit itself to taking action at some point in the future.

When this Court weighs "the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible," the scales are tipped in favor of denying referral by the simple fact that FERC is unable and unwilling to offer any assistance for the foreseeable future. It is perhaps true that in the long run the FERC might eventually initiate proceedings and decide the question. But, in the apt words of Professor Keynes, "in the long run, we're all dead." The fact that FERC has shown a disinclination to even have this question referred to it, much less initiate proceedings, destroys the raison d'etre of the primary jurisdiction doctrine in this instance.

Accordingly, this Court hereby denies defendants' motion to stay and refer the above mentioned issues to the FERC.

## II. DEFENDANT PIPE LINE'S MOTION TO STAY PENDING ARBITRATION

All six contracts in this matter contain arbitration clauses. The two onshore contracts—the Raccourci Island Field (Louisiana) and the Schwarz Field (Texas) contain identical arbitration clauses with sweeping language:

"1. *Any controversy* between the parties hereto arising under this agreement and not resolved by agreement *shall be* determined by a board of arbitration ...

2. The decision of the arbitrators, or the majority thereof, made in writing *shall be final and binding upon the parties* ..." (emphasis added)

The four remaining contracts (all offshore) at issue—the Brazos (Texas), the Vermilion 58 (Louisiana), the Eugene Island 105 (Louisiana), and the West Cameron 494/498 (Louisiana) fields—contain arbitration clauses much narrower in scope.

The Brazos contract provides:

"Any controversy between the parties hereto arising under Article XI 'Price', of this agreement and not resolved by agreement shall be determined by a board of arbitration ..."

The Louisiana contracts all provide:

"Any controversy between the parties hereto arising under Section 5 of Article XI, 'Price', of this agreement and not resolved by agreement shall be determined by a board of arbitration ..."

There is no dispute between the parties arising under Section 5 of Article XI, "Price", of the offshore Louisiana contracts. However, Count IV of plaintiff's complaint does arise under the price provisions of the Brazos contract.

On the basis of the arbitration clauses in question, defendant Pipe Line has moved pursuant to 9 U.S.C. § 3 that this Court stay:

(1) All claims arising out of the Schwarz Field contract (with the exception of the issue of whether "take or pay" payments would violate the NGPA, which it contends should be referred to FERC);

(2) All claims arising out of the Raccouri Island Field contract; and

(3) Count IV of Superior's complaint regarding the price to be paid under the Brazos Field contract.

§ 3 of the Federal Arbitration Act, 9 U.S.C. § 1 et seq., provides:

If any suit or proceeding be brought in any of the courts of the United States

upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

■ At the outset, this Court notes that under the Federal Arbitration Act there is a very strong national policy in favor of arbitration. *Southland Corporation v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Life of America Insurance Co. v. Aetna Life Insurance Co.*, 744 F.2d 409 (5th Cir.1984); *Fund Administration Services, Inc. v. Jackson*, 518 F.Supp. 783 (W.D.La.1981).

This policy is so strong that the relevant Federal law *"requires"* piecemeal resolution or duplication of effort when necessary to give effect to an arbitration agreement. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S.Ct. 927, 939, 74 L.Ed.2d 765 (1983); *Tai Ping Insurance Co., Ltd. v. M/V. Warschau*, 731 F.2d 1141, 1146 (5th Cir. 1984). (emphasis in the original).

### A. THE SCHWARZ FIELD

Superior contends that Pipe Line's motion to stay all claims arising out of the Schwarz contract (with the exception of the legality of the take or pay issue, which Pipe Line moves should be referred to FERC) should be denied on two grounds. Superior argues that Pipe Line has waived or repudiated its right to arbitration, and that in addition a stay pending arbitration is precluded by the doctrine of "intertwining."

■ It is clear that "a defendant can waive arbitration by actions which it takes during determination in the legal forum of the threshhold issue of existence of an arbitration contract, if those actions are sufficiently inconsistent with the right to arbitrate." *General Guaranty Insurance Company v. New Orleans General Agency, Inc.*, 427 F.2d 924, 929 (5th Cir.1970). But "where as here the party seeking arbitration has made a timely demand for arbitration at or before the commencement of judicial proceedings in the Trial Court, the burden of proving waiver falls even more heavily on the shoulders of the party seeking to prove waiver." *Southwest Industrial Import and Export, Inc. v. Wilmod Company*, 524 F.2d 468, 470 (5th Cir.1975).

■ "There is no set rule, however, as to what constitutes a waiver or abandonment of the arbitration agreement. The question depends upon the facts of each case and usually must be determined by the trier of facts." *Burton Dixie Corp. v. Timothy McCarthy Construction Company*, 436 F.2d 405, 408 (5th Cir.1971).

■ There is persuasive authority for the proposition that in order for the moving party's actions to have constituted an effective waiver or repudiation of the arbitration clause, there must be a showing of prejudice to the party opposing the stay. *Carcich v. Rederi A/B Nordie*, 389 F.2d 692 (2d Cir.1968). "It is not 'inconsistency,' but the presence or absence of prejudice which is determinative of the issue [of waiver]." Id at 696. This approach has been followed by at least three district courts in this circuit. See *American Dairy Queen v. Tantillo*, 536 F.Supp. 718, 722 (M.D.La. 1982); *Trade Arbed, Inc. v. S/S Ellispontos*, 482 F.Supp. 991, 999–1000 (S.D.Tex. 1980); and *Gulf Central Pipeline Company v. M/V Lake Placid*, 315 F.Supp. 974, 976 (E.D.La.1970). This Court concludes that this proposition is ultimately controlling because of the language of the court in *E.C. Ernst, Inc. v. Manhattan Construction Co. of Texas*, 559 F.2d 268 (5th Cir. 1977), wherein the court declared that "[P]rejudice ... is the essence of waiver," and cited *Carcich* as authority. 559 F.2d at 269.

■ Superior argues that Pipe Line waived or repudiated the arbitration clause

in question by moving to stay only certain aspects of the dispute arising from the Schwarz Field. Pipe Line moved that the remainder of the dispute—the question of whether the payment in lieu of taking provisions of this contract violate the NGPA of 1978—be stayed and referred to FERC. While it may be inconsistent to request a partial stay on the basis of an arbitration clause which declares that "any controversy" shall be resolved by arbitration, Superior has failed to carry its burden of showing how it has been prejudiced by this inconsistent request. Indeed, this Court concludes, Superior could not have carried this burden because it was not prejudiced. Hence, the request for the referral of an arbitrable issue to FERC did not constitute a waiver of the arbitration clause by Pipe Line.

Superior argues that Pipe Line has also waived its arbitration rights because of actions it has taken with other producers in arbitration proceedings, or the actions it might take in future arbitration proceedings with Superior. The former is simply immaterial, while the latter is speculative at best. If, during the course of the arbitration proceedings, Superior is unsatisfied with Pipe Line's performance or cooperation, there are appropriate remedies that the Federal Arbitration Act provides and Superior could invoke.

■■■■■ Finally, Superior urges that Pipe Line has waived its right to arbitration by requesting the production of thousands of documents and engaging in discovery. This argument is frivolous. Discovery was necessary in order to establish if venue was proper and to defend against Superior's request for a preliminary injunction. All of Pipe Line's discovery activities "were consistent with orderly participation in the lawsuit. They are things which had [Pipe Line] failed to do the court might well have directed it to do in the interests of the case." *General Guaranty Insurance Co.,* supra, 427 F.2d at 929. Participation in discovery, motions challenging venue and counterclaims might constitute a waiver of arbitration, *if the demand for a stay was untimely.* In sum, this Court does not find the "substantial invocation of the litigation process necessary to support waiver of arbitration rights in this case." *American Dairy Queen Corporation,* supra, 536 F.Supp. at 722.

■■■■■ Superior's second ground for opposing a stay is that the doctrine of intertwining is applicable to this case. But, as the 5th Circuit recently declared in *Tai Ping Insurance Co., Ltd.,* supra:

"This argument rests on a fundamental misapprehension of the intertwining doctrine, which is triggered when a party asserts several causes of action, at least one of which falls within the exclusive jurisdiction of the federal courts. In such a case, notwithstanding the existence of an arbitration clause, the entire dispute must remain in federal court to avoid encroachment by the arbitrator into an area that Congress has deemed to be within the Federal courts' exclusive jurisdiction ... [citations omitted] Thus, the areas to which the doctrine applies are, in effect, inherently non-arbitrable. Because it constitutes an exception to the broad pro-arbitration policy embodied in the Arbitration Act, however, the intertwining doctrine is strictly limited to those areas, such as the Federal securities and anti-trust laws, for which Congress has provided that such an exception is appropriate." 731 F.2d at 1146.

Although the case at bar does contain the inherently non-arbitrable issue of antitrust, Superior concedes that because the ultimate facts of the antitrust claim are neither identical nor similar to the arbitrable claims, a stay in this suit is not precluded by Superior's antitrust claims. Since there is no other claim in this matter based on an area of exclusive federal jurisdiction, the intertwining doctrine has no bearing here.

### THE RACCOURCI ISLAND FIELD CONTRACT

Superior objects to a stay of all claims arising out of the Raccourci Island contract on the same grounds it objected to a stay of the Schwarz contract claims (except that

there is no FERC referral and inconsistency issue here). Those arguments fail here for the same reasons assigned above.

## THE BRAZOS FIELD CONTRACT

Superior objects to a stay of its claims arising out of the "Price" section of the contract, as stipulated by the arbitration clause, on the same grounds it objected to a stay of the Raccourci Island contract claims. Those arguments fail here as well.

■ Superior also argues that the Texas arbitration statute, Ver.Ann.Civ.Stat. Art. 224, voids the arbitration clause in this contract. This argument, however, ignores the fact that the Brazos Field is on the outer continental shelf. § 1331 of the OCSLA provides that the law of the adjoining state applies insofar that it is not inconsistent with federal law. And since "§ 2 [of the Federal Arbitration Act] is a congressional declaration of the liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," *Moses H. Cone Memorial Hospital,* supra, 103 S.Ct. at 941, Federal law prevails over the Texas statute.

## CONCLUSION

Having found that the defendant Pipe Line has not waived its right to arbitration, and that the doctrine of intertwining does not preclude the issuance of a stay pending arbitration, this Court notes the language of the Supreme Court in the analogous context of the enforceability of forum selection clauses:

> The choice of that forum was made in an arm's length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts. *The Bremen v. Zapata Offshore Company,* 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972), cited by the court in *Tai Ping Insurance Co., Ltd.,* supra, 731 F.2d at 1145.

Accordingly, this Court is compelled to stay all claims arising from the Schwarz and Raccourci Island Field contracts, and all claims arising under the "Price" provision of the Brazos Field contract.

## III. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Superior has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure that this Court render a summary judgment in its favor against Pipe Line as to the latter's liability to take the contracted-for quantities of natural gas from the Vermilion and West Cameron fields. Superior asserts that Pipe Line's affirmative defenses, even assuming the alleged facts underlying them for purposes of this motion, are insufficient as a matter of law to excuse the *failure to take* contracted-for quantities of natural gas. The first inquiry for this Court, however, is that of choice of law.

## A. CHOICE OF LAW

■ As noted earlier in this opinion, § 1333 of the OCSLA prescribes that the law of the adjoining state—to the extent it is not inconsistent with federal law—governs questions arising out of the activities on the Outer Continental Shelf. Since both the West Cameron and Vermilion Fields are on the Louisiana OCS; Louisiana conflicts law will govern the resolution of these disputes.

Both of these contracts were executed in Houston, Texas. Yet both have "effect" in Louisiana, in the sense that the gas is produced on the Louisiana OCS, and delivery is through pipelines which run from onshore Louisiana to the Louisiana OCS. Superior argues that Louisiana substantive law applies, while Pipe Line counters that Louisiana conflicts rules require the application of Texas substantive law.

At the outset, this Court notes the language of Louisiana Civil Code Article 10:

> The form and effect of public and private written instruments are governed by the

laws and usages of the places where they are passed or executed.

But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.

This Court has no doubt that the West Cameron and Vermilion contracts "have effect" in Louisiana for purposes of Article 10. The gas is delivered to pipelines which lead from the Louisiana OCS to onshore Louisiana. The local offices of the parties physically administer the sales. And, under the OCSLA, Louisiana law is extended seaward (to the extent that it is not inconsistent with federal law) so that the Louisiana OCS *is* part of Louisiana for our purposes. Accordingly, a strict application of Article 10 would result in Louisiana substantive law governing these contracts.

Pipe Line argues vigorously, however, that Article 10 has essentially been abandoned by Louisiana courts in favor of the "interests analysis" of the 2d *Restatement of Conflicts of Laws* (1971). See *Jagers v. Royal Indemnity Company*, 276 So.2d 309 (La.1973); *Sutton v. Langley*, 330 So.2d 321 (La.App.2d Cir.1976); *Burns v. Holiday Travels, Inc.*, 459 So.2d 666 (La.App. 4th Cir.1984). In addition, Pipe Line notes, the Fifth Circuit has stated:

> "(1) that the *current* approach to the choice of law in Louisiana is that embodied in the *Restatement,* and
>
> (2) that under that approach the interest analysis of the second paragraph of the *Restatement* is to be applied in all cases, regardless of the literal reach of Article 10." (emphasis added)

*Lee v. Hunt*, 631 F.2d 1171, 1176 (5th Cir. 1980).

This Court, however, has grave doubts as to whether the summation of the law in *Lee* is true today, well over four years later. In *Shaw v. Ferguson*, 437 So.2d 319 (La.App.2d Cir.1983), the Court declared:

> It is our view that *Jagers* mandates the application of the modern interest analysis in those circumstances *where the choice of law is not specifically governed by statute. Jagers* dealt with a

tort, and there is no civil code article or revised statute which stipulates what law is to be applied in the case of a tort. Thus, the holding of *Jagers,* when properly confined to its underlying facts, is that the modern interest analysis will be applied to choose the governing law in a tort suit. A broader and rationally justifiable interpretation of *Jagers* is that it mandates the application of a modern interest analysis in the absence of a statute which stipulates the applicable law. However, we do not believe that *Jagers* held that the modern interest analysis is to be applied when such an application would effectively nullify a statute which specifically governs the conflicts issue presented. As Judge Edwards noted in his dissent in *Wickham* [*v. Prudential Insurance Co.*, 366 So.2d 951 (La.App. 1st Cir.1978)], 'the two cases cited in support of the interest analysis theory [*Jagers* and *Sutton* ] do not address [a directly applicable] codal provision.' " Id. at 322 (emphasis in the original).

See also *Scott Truck and Tractor Company v. Daniels*, 401 So.2d 590 (La.App.3d Cir.1981), where contract was intended to have effect in Texas, Article 10 mandated application of Texas law; *Wilson v. Gulf Insurance Company*, 431 So.2d 1095 (La. App.3d Cir.1983), "A Court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law [citing *Restatement* 2d, § 611]," Id. at 1097; and *Laubie v. Sonesta International Hotel Corporation*, 752 F.2d 165 (5th Cir.1985), "In Louisiana, a civil law jurisdiction, the legislative will, as expressed in the articles of the [Civil] Code, is supreme. Case law, although valuable, is of secondary importance."

But even if the *Restatement* supercedes (especially in the realm of contract) Article 10, this Court concludes that the interests analysis of the *Restatement* supports the application of Louisiana law. § 188(2) of the *Restatement* provides:

> (2) In the absence of an effective choice-of-law by the parties, the contacts to be taken into account in applying the princi-

ples of § 6 to determine the law applicable to the issue include:

(a) The place of contracting.

(b) The place of negotiation of the contract.

(c) The place of performance.

(d) The location of the subject matter of the contracts; and

(e) The domicile, residence, nationality, place of incorporation and place of business of the parties.

These contracts are to be evaluated according to their *relative importance with respect to the particular issue.* (Emphasis added).

Factors (a) and (b) clearly augur in favor of Texas Law, since Houston was the place of negotiation and execution of the contracts.

Factors (c) and (d) likewise clearly augur in favor of the application of Louisiana law, since the place of performance (taking) and the subject matter of the contracts are both located in Louisiana or on its OCS.

Factor (e) is of no help because of countervailing elements. Although the principal places of business of the parties are in Houston, Texas, both parties have significant Louisiana offices and enterprises as well.

What is decisive for this Court is that Superior seeks the remedy of specific performance of Pipe Line's obligation to take contracted-for quantities of natural gas. Since the place of this performance will be on the Louisiana OCS, this Court concludes Louisiana's interest is considerably greater than that of Texas, the situs of the negotiation and execution of the contracts in question.

In addition to Article 10 and the "interest analysis" of the *Restatement,* this Court concludes that application of Louisiana law is warranted by a third factor: the fact that the parties stipulated in these contracts that the senior district judge in the Western District of Louisiana would name the third arbitrator to the arbitration panels under the contracts. This evidences an intent that the contracts would have effect in Louisiana and be governed by Louisiana law.

Finally, even if this Court has erred and Louisiana conflicts law would apply Texas law, Texas law would send the question straight back to Louisiana. It is clear in the Texas jurisprudence that "where the contract is made in one jurisdiction but to be performed in another the presumption arises that the parties contracted with reference to the place of performance [citations omitted]." *New York Life Insurance Company v. Baum,* 700 F.2d 928 (5th Cir. 1983).

## B. ALTERNATIVE OBLIGATIONS

Before considering the merits of Pipe Line's affirmative defenses, it is critical to understand the precise nature ·of the obligations in question and the requested relief. What is at issue in this motion is the enforcement of one item of performance of an *alternative obligation.*

Louisiana Civil Code Article 1808 (1985) declares that:

An obligation is alternative when an obligor is bound to render only one of two or more items of performance.

Some of the comments to Article 1808 are enlightening:

(b) ... One obligation admits of only one performance, but that performance may consist of a number of different 'items of performance'. In the case of an alternative obligation, the items of performance are specified in the alternative.

(d) The distinction between an alternative obligation and a penal clause is that the former is a primary obligation which may be satisfied in one of several ways while the latter is a secondary obligation which can be enforced only if there is also a valid primary obligation which the obligor fails to perform without lawful excuse. In the penal clause, the obligor has no real 'choice' as such; he cannot simply elect to pay the penalty rather than perform the primary obligation. If he does, the creditor may still sue for

specific performance of the primary obligation.

Other pertinent articles of the 1984 revision are:

Art. 1809. When an obligation is alternative, the choice of the item of performance belongs to the obligor unless it has been expressly or impliedly granted to the obligee.

Art. 1810. When the party who has the choice does not exercise it after a demand to do so, *the other party may choose the item of performance.* (emphasis added)

Art. 1811. An obligor may not perform an alternative obligation by rendering as performance a part of one item and a part of another.

Art. 1812. (1) When the choice belongs to the obligor and one of the items of performance contemplated in the alternative obligation becomes impossible or unlawful, regardless of the fault of the obligor, he must render one of those that remain.

■ Applying the foregoing articles of the Civil Code to the facts at bar, it is apparent that the take *or* pay provisions of the Vermilion and West Cameron contracts are alternative obligations. Thus, regardless of the legality or enforceability of the payment provisions, the first item of performance—taking—is still available.

Pipe Line has refused to choose its item of performance, and thus that choice has fallen to the obligee, Superior. Superior, in its motion for summary judgment, has requested specific performance of Pipe Line's item of performance by taking the contracted-for minimum quantities of natural gas from the West Cameron and Vermilion Fields. This Court, then, must consider Pipe Line's affirmative defenses to *performance by taking.*

## 1. FORCE MAJEURE

■ Defendants' first affirmative defense to its obligation to take is that of force majeure. Article V of Exhibit "B" to both the Vermilion 58 and West Cameron 498 contracts provide:

1. The provisions of this agreement shall not be applicable nor shall the parties to this agreement be liable for damages to the other for any act, ommission, or circumstances occasioned by, or in connection with or as a consequence of, any acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, sabotage, wars, blockades, insurrections, riots ... or any other cause, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension and which, by the exercise of due diligence, such party is unable to prevent or overcome ...

2. Such causes or contingencies affecting the performance of this agreement by any party hereto, however, shall not relieve such party of liability in the event of its concurring negligence or in the event of its failure to use due diligence to remedy the situation and remove the cause in an adequate manner and with all reasonable dispatch, nor shall such causes or contingencies affecting the performance of this agreement relieve any party hereto from its obligations to make payments of amounts then due *nor shall such causes or contingencies relieve any party of liability unless such party give notice and full particulars of the same in writing or by telegraph to the other party as soon as possible after the occurrence relied on, and like notice shall be given upon termination of such Force Majeure conditions* (emphasis added).

Pipe Line argues that due to various force majeure events outside of its control, it is relieved of its liability to take the contracted-for quantities of natural gas.

Without determining whether the events Pipe Line cites are encompassed by the force majeure clauses of the parties' contracts, this Court concludes that Pipe Line is barred from asserting a force majeure defense because it failed to properly invoke the force majeure clause. The clause provides that "nor shall such causes or contingencies relieve any party of liability unless

such party give notice and full particulars of the same in writing or by telegraph to the other party as soon as possible after the occurrence relied on." Pipe Line has not complied with this requirement. Hence, there is no issue of material fact for this Court to try on the affirmative defense of force majeure. Under the very terms of the force majeure clause, Pipe Line is not relieved of its liability to take even if those events it cites did constitute force majeure.

## 2. ERROR/FAILURE OF CAUSE

Although these arguments are primarily asserted as affirmative defenses to the item of performance by paying, it is possible through liberal construction to apply them to performance by taking. This Court, however, is unconvinced. As Professor Litvinoff has ably stated:

> Cause—or end—is distinguishable from the motive that prompts the debtor to bind himself. The motive is the accidental reason that induces a person to enter into a contract. It is subjective, and therefore, it varies with each individual ... the purchaser may buy because he moved to that locality, or thinks that the purchase is the best investment for his capital, or just to gain prestige.

> The motive bears a decisive influence upon the party's will. However, an error in motive does not nullify the obligation. 1 Litvinoff § 220 (La.Civil Law Treatise, 1969).

Undoubtedly, Pipe Line was in error as to its motive for entering into this obligation. The market has simply not evolved in the manner anticipated. But this error is far from an error in the obligation itself. And Pipe Line has failed to establish an issue of fact as to whether there was error as to the principal cause of the contract, i.e., a certain price for a certain quantity of natural gas.

## 3. COMMERCIAL IMPRACTICABILITY

This Court rejects this argument on the grounds that no court in Louisiana has unequivocally embraced this common law doctrine.

## CONCLUSION

■■■ Pipe Line has failed to establish a genuine issue of material fact as to its liability to take certain minimum quantities of natural gas under the Vermilion and West Cameron contracts. Accordingly, Superior is entitled to a partial summary judgment compelling Pipe Line to take its contracted-for minimum quantities of natural gas.

The Court declines at this time to consider Pipe Line's affirmative defenses to the item of performance by paying, since those issues are immaterial for purposes of this motion.

## SUMMARY

To recapitulate, this Court:

(1) Hereby denys defendants' motion to stay certain claims and refer them to FERC.

(2) Hereby stays all claims (save antitrust) arising out of the Schwarz and Raccourci Island contracts, as well as the "Price" Provision of the Brazos contract.

(3) Grants Superior's motion for a partial summary judgment on Pipe Line's liability to take.

## ON REHEARING

Defendant Transcontinental Gas Pipe Line Corporation (Pipe Line) has moved for a new trial, or alternatively to alter or amend the Judgment and Order of this Court of February 13, 1985.

The contracts in question provide that in order for force majeure to relieve a party of its obligations, the party is required to (1) give notice, *and* (2) the full particulars of the force majeure event(s) in writing to the other party. While some of the letters Pipe Line relies upon (plaintiff's exhibits 10B1 through 10B10 from the preliminary injunction hearing, as well as the attachment to Pipe Line's motion) did discuss, in varying detail, two of the force majeure conditions Pipe Line alleges (e.g., the mild winter of 1982–1983 and the drop in relative price of competing fuels), none gave notice that Pipe Line considered itself

relieved of its obligations due to the occurrence of force majeure conditions.

Pipe Line also asserts that it is uncertain what "increased quantities of gas" it will have to take from the two fields "to prevent waste or loss of reserves," to comply with this Court's order. Pipe Line is simply reminded that it is bound to perform its obligations in good faith, and that entails protecting Superior from such losses.

Accordingly, Pipe Line's motion is denied.