511 So.2d 809 (1987)
POGO PRODUCING COMPANY
v.
UNITED GAS PIPE LINE COMPANY.
No. CA-7621.
Court of Appeal of Louisiana, Fourth Circuit.
July 22, 1987.
*810 David R. Richardson, Galen S. Brown, Robert E. Arceneaux, Margaret E. Woodward, David B. Girard, James E. Bailey, Barham & Churchill, New Orleans, Paul G. Van Wagenen, Janice Cleavinger, Ronald B. Manning, Houston, Tex., Pogo Producing Co., for plaintiff-appellant, Pogo Producing Co.
Donald A. Hoffman, Donald Ensenat, R. Joshua Koch, Jr., W. Joe Mize, George W. Reese, Carmouche, Gray & Hoffman, New Orleans, W. Devier Pierson, James M. Costan, Pierson Semmes and Finley, Washington, D.C., H. Bruce Golden, Adrian L. Steel, Jr., William H. Knull, III, Mayer, Brown & Platt, Houston, Tex., for defendant-appellee United Gas Pipe Line Co.
Before GARRISON, BARRY and WARD, JJ.
WARD, Judge.
The question presented in this appeal is whether Pogo Producing Company is entitled to a preliminary injunction requiring United Gas Pipe Line Company to take and pay for certain minimum quantities of natural gas pursuant to contracts between the parties. Pogo claims that its reservoirs will suffer irreparable harm if United is not required to take the gas pending resolution of the suit for specific performance of the contracts. After considering extensive expert evidence, a Commissioner of the Civil District Court found no irreparable harm. The District Judge rejected Pogo's exceptions to the Commissioner's report and denied the preliminary injunction. Pogo's appeal is solely on the issue of irreparable harm. We affirm.
In the six gas purchase contracts at issue, United agreed to buy from Pogo natural gas produced from 21 reservoirs in six blocks located off the coast of Louisiana: East Cameron 335, High Island 355, High Island 356, South Pass 57, South Pass 58, and South Pass 78. Pogo owns approximately a 42 percent working interest in East Cameron 335; its interest in the other blocks ranges from approximately 9 to 20 percent. Only a portion of the gas from Pogo's interest in each block is dedicated to United.
*811 Each of the gas purchase contracts provides that United shall take delivery of, or pay for without taking delivery of, a specified quantity of gas each year ("Annual Minimum Quantity" or "AMQ"). For the East Cameron 335 block the AMQ is 80 percent of the delivery capacity of Pogo's working interest in the reservoirs; for each of the remaining blocks, the AMQ is 85 percent of the delivery capacity of Pogo's interest. This take-or-pay provision of the contracts allows United to "make up" gas paid for but not taken during the year under the AMQ requirement by taking the gas in a subsequent year. Additionally and more importantly for purposes of this litigation, each of the contracts also provides for minimum takes, that is, United must take delivery of and pay for 5.42 percent of the AMQ each month ("Monthly Minimum Quantity" or "MMQ"). The MMQ take requirement is independent of the AMQ requirement and cannot be satisfied by paying for gas not taken; hence, the MMQ requirement has no "make up" provision.
The six contracts were executed between 1976 and 1982. While the contracts were, in effect, in July of 1985, United notified Pogo (as well as other suppliers) by letter that it was unable to meet its obligations under the purchase contracts due to several factors beyond its control. Specifically, United cited "extraordinarily mild temperatures which constitute a radical departure from normal weather patterns; a severe and prolonged economic recession; a precipitous drop in the price of fuels competitive with natural gas; accelerated increases in producer deliverability; increased consumer conservation; and radical changes in the structure of the industry." In the letter, United also blamed its inability to take gas on regulatory actions of the Federal Energy Regulatory Commission. United stated that it "must continue to take steps to prorate our purchases" and referred to two 1983 letters in which it had recommended price reductions and other modifications in its contracts. In April and May of 1986, United further notified Pogo that it "cannot continue to purchase gas under contracts that are not responsive to current regulatory and market conditions." United again offered contract modifications which Pogo refused.
Beginning in early 1986, United consistently took less gas than the MMQ required under its contracts with Pogo. In August, Pogo filed this lawsuit for preliminary and permanent injunctive relief and later amended its petition to pray for a declaratory judgment and specific enforcement of the contracts. Following a removal to and a remand from federal court, Pogo's request for a temporary restraining order was denied in the Civil District Court, and the preliminary injunction was heard by a Commissioner of that Court.
The issue at the hearing on the preliminary injunction, as in this appeal, was whether Pogo proved that United's actions caused irreparable injury. The party requesting a preliminary injunction must show that irreparable injury, loss or damage may otherwise result unless an injunction is granted. La.C.C.P. art. 3601. Irreparable injury is a loss which cannot be adequately compensated in money damages or which cannot be measured by a pecuniary standard. Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981). In addition to the showing of irreparable injury, the moving party also must make a prima facie showing that he will prevail on the merits of the suit. General Motors Acceptance Corp. v. Daniels, 377 So.2d 346 (La.1979).
Pogo asserts that irreparable injury will occur because United's takes of its gas at less than the MMQ level cause the irretrievable loss of an incalculable amount of gas. This loss occurs because, Pogo contends, the reservoirs are water drive reservoirs, that is, a portion of the energy for production comes from the influx of water into the reservoir, bypassing some gas which is trapped behind the advancing water. Pogo argues that although some gas will always be trapped and lost, United's refusal to purchase the minimum takes and its curtailment of production exacerbates the problem by increasing the amount of irretrievably trapped gas, causing irreparable injury. These losses, Pogo contends, *812 cannot be calculated to a certainty or accuracy required for compensation in money damages. United contends that Pogo failed to prove irreparable harm because a decrease in United's takes has no effect upon the reservoir pressure nor does it increase the amount of trapped gas that is lost to production. In the alternative, even if low production causes an increase in the amount of trapped gas, United argues that the losses can be reliably calculated for an award of compensatory damages.
The Commissioner made findings of fact that gas was not being lost and that irreparable harm would not result from United's reduced takes, and even if gas were lost to commerce as a result of reduced production, the value of the lost gas could be determined and Pogo compensated in money damages. Having found no irreparable harm, the Commissioner did not make a determination of the likelihood of Pogo's prevailing on the merits of the suit for specific performance. The Commissioner's factual findings were accepted and adopted by the Trial Court judgment.

THE STANDARD OF REVIEW
Pogo maintains that the Trial Judge did not make a de novo determination from the evidence but only reviewed the Commissioner's findings for manifest error, and because we are in the same position as the Trial Judge to evaluate written evidence, the Trial Court judgment should not be reviewed under the manifest error standard. We agree with Pogo only insofar as the Trial Judge was constitutionally required to make a de novo determination of the Commissioner's factual findings and his recommendation. Bordelon v. Louisiana Department of Corrections, 398 So.2d 1103 (La.1981). We cannot agree, however, with Pogo's assertion that the Trial Judge failed to make such a determination. He heard and considered Pogo's exceptions to the Commissioner's report. In his oral reasons for adopting the Commissioner's recommendation, he stated:
The Court has reviewed the record and frankly says that he feels that Commissioenr Rivet went into depth in this case, in a great deal of detail. The Court may disagree here and there with some of Commissioner Rivet's points, but taking the matter as a whole, it cannot see where it concludes that his conclusion is in error according to the facts and the testimony he heard.
This statement is the only proof offered by Pogo to support its assertion that the Trial Judge improperly applied a manifest error standard to his review of the Commissioner's findings and that he failed to make a de novo determination. We reject the inference which Pogo would have us draw from loose language in this statement. In the absence of stronger proof, we conclude that the Trial Court ruling was based upon a de novo determination of the evidence and therefore reject as inapplicable those cases cited by Pogo which were remanded for a de novo review of the Commissioner's findings or for the hearing of exceptions to the Commissioner's report.
Having found the Trial Court properly reviewed the Commissioner's report, we now consider whether the Trial Court judgment should be reviewed under the manifest error standard. This question is answered in Virgil v. American Guarantee and Liability Insurance Co., 507 So.2d 825 (La.1987). In that case, the Supreme Court reiterated, citing Canter v. Koehring Co., 283 So.2d 716 (La.1973), that a Trial Judge's capacity to evaluate live witnesses is not the only reason for the manifest error rule. That standard of review is also based "upon the proper allocation of trial and appellate functions between the respective courts." Accordingly, we now review the evidence which was before the Trial Court to determine whether its findings of fact were manifestly erroneous.

THE EVIDENCE
Whether there is irreparable harm turns on the question of whether the reservoirs are "rate sensitive". Rate sensitivity means that the rate of production of gas affects the reservoir pressure  the greater the production, the lower the pressure. Rate sensitivity is crucial to both Pogo and United because they agree that higher reservoir *813 pressure causes more gas to be irretrivably trapped by the encroaching water.
To prove irreparable harm Pogo presented the testimony of two experts to show that the majority of the 21 reservoirs are water driven and hence sensitive to the rate of production. Pogo's first expert witness was Bill R. Hise, a consulting petroleum engineer who had worked for Shell Oil Company for eight years and taught petroleum engineering at LSU for 16 years. Prior to trial, Pogo's attorney had asked Hise to study the reservoirs under two of the blocks to determine whether a reduction in the production rate would cause a loss of otherwise recoverable gas. Using data supplied by Pogo, Hise identified nine water drive, two depletion drive, and one indeterminate drive reservoir. Hise stated that water drive reservoirs are invariably sensitive to rates of production because, while the influx of water increases the gas pressure, the pressure can either be lowered by a high rate of production of gas from the reservoir or the pressure can be allowed to build if the gas is not taken or is taken at low rates. Hise declined to give an opinion upon any distinction between strong and weak water drive reservoirs, although he stated that their rate sensitivity may indeed differ. In Hise's opinion, all water drive reservoirs should be produced at as high a rate as is feasible in order to maintain low pressure, reducing the density of the reservoir gas, and thereby minimizing the amount of gas that will be trapped. Hise testified that because the majority of the reservoirs he studied were water drive and therefore rate sensitive, otherwise recoverable gas was being trapped and the reservoirs were being irreparably damaged by United's taking less than the MMQ.
Hise testified that it was possible to calculate the amount of gas lost through low production of a water drive reservoir. Nonetheless, he had not attempted to quantify the recoverable gas which was being trapped in the reservoirs he studied because it was his opinion that such a calculation would not be reliable due to the number and high degree of uncertainty in the variables required for the calculation. On cross-examination, Hise admitted that it is possible to make an estimate of the present remaining gas in place in a reservoir  then, upon depletion of the reservoir following curtailed rates of production, the difference between the gas actually produced and the estimate would represent the amount of gas trapped in the formation. Hise insisted, however, that a determination of the losses that are occurring in the reservoirs at issue would require a calculation based upon future rates of production which are presently unknown. Hence, he maintained that such calculations cannot be made in this case.
Pogo's second expert witness was Dr. William J. Bernard, a petroleum engineer who has been teaching at LSU for sixteen years. In preparation for his testimony, Bernard was asked to examine nine reservoirs in three blocks and identify their drive mechanisms and determine whether curtailment of production could cause loss of otherwise recoverable gas. Bernard's study indicated eight water drive reservoirs and one whose drive mechanism could not be determined. Like Hise, Bernard testified that the phenomena surrounding the rate sensitivity of water drive reservoirs are not well-known because production was rarely curtailed until recent years. Bernard further testified, consistent with the theory espoused by Hise, that in the water drive reservoirs he examined, curtailed production was causing more gas to be trapped than if production had been continued at the MMQ level. He also stated that although Pogo owns a fairly small percentage of the gas in the blocks and an even smaller percentage is allocated to United, takes by United at the MMQ level would reduce the loss of otherwise recoverable gas.
Bernard then testified that, even using the most sophisticated computer simulation of a reservoir, there is no reliable way to calculate the amount of gas that is being trapped due to United's low takes. Bernard's opinion, succinctly stated, was that, "the technology is there, but the data is not." He said that reservoir engineers could make the calculations, but that every *814 engineer would come up with a different answer due to unavailable data and the engineers' varying interpretations of the data which exists. He testified that because Pogo knew that he believed it was impossible to make a reliable calculation of the amount of gas that would be irretrievably trapped, Pogo did not ask him to do so.
United called as its first expert witness Gene "Skip" Wiggins, III, a mechanical engineer and vice-president of a consulting petroleum engineering and geological firm. Wiggins teaches part-time at Tulane University and lectures for the American Association of Petroleum Geologists. United had asked Wiggins to review all of the reservoirs involved in this litigation and to determine whether each was rate sensitive. Although Wiggins agreed with Pogo's experts that lower reservoir pressure is generally desirable to lessen the amount of trapped gas in a water drive reservoir, he testified that a higher production rate could not lower the pressure in the reservoirs at issue. Wiggins, like Hise and Bernard, identified both water drive and depletion drive reservoirs. Wiggins' opinion, however, was not primarily based on whether the mechanism was water drive or depletion drive; it was based on "rate sensitivity." Unlike Pogo's experts, Wiggins made a distinction between water drive reservoirs and partial water drive reservoirs, and he believed that only partial water drive reservoirs are sensitive to rates of production. Like depletion drive reservoirs, reservoirs which are driven entirely by the influx of water are not rate sensitive, in Wiggins' opinion, because "there is a corresponding unit volume of water influxing into the reservoir that is displacing the gas as it's produced out," effectively maintaining the reservoirs' pressure. Regardless of how quickly the gas is taken from the reservoir, it will be replaced by an equal volume of water and the pressure will remain constant. On the other hand, in a partial water drive reservoir, Wiggins testified that the volume of water flowing into the reservoir is less than that of the gas being produced out. Accordingly, a faster take of gas could reduce pressure in a partial water drive reservoir.
Wiggins then presented charts he had prepared for each of the reservoirs at issue based upon the data used by Pogo's experts. Wiggins' explained that the charts showed that throughout the production history of 18 of the 21 reservoirs, the pressure had not varied with fluctuations in production rates. Hence, in Wiggins' opinion, the reservoirs were not rate sensitive, and United's reduced takes could not lead to the trapping of otherwise recoverable gas. Wiggins found that the remaining three reservoirs had various production problems and also would not be affected by reduced production. On cross-examination, Pogo's counsel attempted to show that the trend lines on Wiggins' charts, which purportedly illustrated the reservoirs' pressure readings plotted against their production histories, were unreliable because they were based upon his subjective evaluation which discounted as erroneous or anomolous any data which indicated rate sensitivity.
On the question of whether Pogo's loss, if any, can be calculated, Wiggins testified that prior to this litigation he had never dealt with the calculation of gas lost by low delivery from rate sensitive reservoirs; nonetheless, he believed such calculations could be made and corroborated using the same data sources as are used in making reserve estimates.
United's second expert witness testified chiefly with regard to these calculations. Walter L. Dowdle, the president of a firm which performs reservoir engineering and reservestudies, has specialized for 16 years in computer simulation of petroleum reservoirs. He testified that most of the data required for the calculation of reserves is generally available for mature reservoirs, such as those involved in this case, and that missing data could be inferred through correlation, history matching, or other generally accepted techniques. Like the other experts, he pointed out that reserve estimates are routinely made and used in the petroleum industry as the basis for buying, selling and developing reserves. Asked to assume rate sensitive reservoirs *815 and losses of otherwise recoverable gas, Dowdle stated his opinion that calculations of the amount of gas trapped in a reservoir are as reliable as reserve estimates. Dowdle, however, admitted that he was not asked by United to actually perform such a calculation for the reservoirs involved in this litigation, and he had not done detailed studies of the reservoirs.
To summarize this evidence, the theory upon which Pogo relies is based upon the fact that higher gas pressure in a reservoir compresses more gas molecules into the available space, making the gas more dense and thereby increasing the amount of gas trapped per unit volume when bypassed by the water flowing into a water drive reservoir. Both Pogo's and United's expert witnesses agreed upon the soundness of this rule of physics. The experts were sharply divided, however, as to whether a decrease in the production rate from the reservoirs in question would cause an increase in the gas pressure. Pogo's experts testified that the pressure in a water drive reservoir will always increase when production is curtailed and water continues to flow into the reservoir. The theory advanced by Pogo's experts holds, that once a reservoir is determined to be water driven, it follows inexorably that the reservoir is rate sensitive and should be produced at as high a rate as is feasible to maintain a low pressure  resulting in less dense trapped gas and minimizing losses. Although United's experts agreed that the majority of the reservoirs are water drive, they found that the reservoirs are not rate sensitive. United's charts and analysis of the data showed that varying rates of production had not affected the pressure of the reservoirs throughout their production history.
The expert witnesses also differed in their opinions of whether Pogo's losses, if any, could be calculated and compensated by money damages in the event United is found to have breached the contracts. Pogo's experts testified that the increased amount of gas which would be lost due to curtailed production could not be computed with any degree of reliability. Although admitting that reserve estimates are routinely made and used in the petroleum industry, Pogo's experts testified that such estimates are subject to many uncertainties and that estimates of the amount of gas lost through low rates of production are inherently even more unreliable. On the other hand, United's experts testified that any losses Pogo sustained could be calculated as reliably as reserve estimates are made and therefore could support compensatory damages.

POGO'S ASSIGNMENTS OF ERROR
In addition to Pogo's argument as to the standard of review, Pogo assigns three errors:
(1) the legal standard of reasonable accuracy and sufficient legal certainty was ignored in the finding that Pogo's injuries were not irreparable because they could be calculated in money damages;
(2) it was error to find that Pogo's reservoirs are not suffering damage due to under-production resulting from United's breaches of contract; and
(3) the Commissioner's limitation on cross-examination of United's expert witness justifies reversal.
Although Pogo focused its first assignment of error on the calculability of the alleged damage to its reservoirs, that issue is subsidiary to the issue raised by Pogo's second assignment of error  whether the reservoirs are sustaining damage due to United's low takes of gas. Therefore, we have chosen to examine the question of damages before we consider whether they are capable of calculation.
In arguing that the Trial Court erred by adopting the Commissioner's finding that the reservoirs are not being damaged by low production, Pogo challenges both the qualifications of United's expert and the bases of his opinions. The weight to be given to the testimony of experts is determined by the professional qualifications and experience of the expert and by the facts and studies upon which his opinion is based. State, Department of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972).
*816 Pogo acknowledges that its experts based their studies, and hence their opinions, upon the same data used by United's experts. Pogo argues however that its experts, Hise and Bernard, possess professional qualifications superior to those of United's experts, entitling the opinions of Hise and Bernard to greater weight. Hise and Bernard each have bachelor's and graduate degrees in petroleum engineering and a combined thirteen years experience in petroleum engineering. Additionally, each has taught petroleum engineering at LSU for sixteen years. Wiggins, United's chief expert in rebuttal to Hise and Bernard, holds a B.S. in mechanical engineering and an M.B.A., and has two years employment experience with Getty Oil Company and six years with a consulting firm. Arguably, the experts do not possess the same qualifications. Accordingly, in making his findings based upon the evidence as a whole, the Commissioner should have considered that the qualifications of Pogo's experts carried somewhat more weight. A judgment adverse to Pogo does not necessarily mean that the Commissioner failed to do this. Rather, the findings and the judgment merely indicate that United's evidence, when considered as a whole, carried more weight with the Commissioner and the Trial Judge.
Pogo's arguments challenging United's expert evidence focus upon many technical points, but primarily upon United's expert's use of trend lines to illustrate the lack of rate sensitivity and that expert's admission that the reservoirs are only "practically" rate insensitive. The trend lines which Pogo challenges were drawn by Mr. Wiggins on the charts he prepared for each reservoir to connect the pressure readings from the reservoir plotted in conjunction with the rates of production throughout the reservoir's production history. United admits, and it is clearly apparent from an examination of the charts, that some pressure readings do not fall on the trend lines. Pogo maintains that these points above and below the trend lines indicate that pressure in the reservoirs has been responsive to fluctuating rates of production and that the lines were drawn merely to obfuscate this rate sensitivity. Wiggins explained that he drew the trend lines  which are an accepted engineering tool  to facilitate his analysis of the reservoirs and to graphically illustrate his testimony at the hearing. He testified on cross-examination, in response to the same allegations which Pogo now raises, that he did not give equal weight to all pressure readings because, in light of a number of factors, some were more reliable than others. He explained that the isolated readings off the trend lines do not indicate rate sensitivity; instead they are defective or unreliable data.
Pogo also challenges Wiggins' testimony by pointing out the inconsistency of his opinion that the reservoirs are not rate sensitive and his admission that a "perfect" water drive mechanism  which would create a rate insensitive reservoir  cannot exist in nature. To emphasize the contradiction, Pogo argues that both Wiggins and its experts testified that a "perfect" water drive reservoir does not exist because water cannot replace gas instantaneously; hence, there must be some drop in pressure as the gas is produced out but before it is replaced by water  even in the strongest of water drive reservoirs. United discounts this phenomenon as only theory and emphasizes the results of Wiggins's studies which show water drive reservoirs in which the water flows in so quickly and with such force that there is no measurable reduction in pressure as gas is withdrawn.
To find reversible error in the findings on these points, we must conclude that those findings are manifestly erroneous  clearly wrong or unsupported by the record. We have reviewed and described in some detail the evidence presented by both parties, including the lengthy, in-depth testimony and extensive, detailed documentation of United's experts, which showed no discernable correlation between actual reservoir pressure and rates of production in 18 of the 21 reservoirs. In light of this evidence, we cannot say the Trial Court's findings are unsupported by the record or that the judgment in favor of United is manifestly erroneous.
*817 We must briefly address Pogo's argument based upon Pogo Producing Co. v. Sea Robin Pipeline Co., 493 So.2d 909 (La.App. 3rd Cir.), writ denied 497 So.2d 310 (La.1986). That case affirmed the granting of a preliminary injunction, holding that Pogo had proven that low production would cause irreparable injury to its water drive reservoirs. Pogo argues that the Sea Robin decision is particularly persuasive because eight of the 21 reservoirs involved in the instant case were also among those in Sea Robin. We reject this argument for two reasons. The Third Circuit in Sea Robin agreed with the Trial Court that a "majority" of the 21 reservoirs at issue in that case had "at least a partial water drive." Because the Sea Robin opinion does not identify specific reservoirs, we have no way of knowing which, if any, of the eight reservoirs which are at issue in our case were among the "majority" of the 21 reservoirs in Sea Robin. A more fundamental flaw in Pogo's Sea Robin argument is that the Civil District Court had before it different evidence than that considered by the Trial Court of the Third Circuit. This is not to say that the Third Circuit was in error or that our holding creates a conflict between our circuits; the holdings are consistent  the factual findings of the trial courts are not manifestly erroneous.
In the next assignment of error which we consider, which is Pogo's first assignment of error, Pogo contends that the Trial Court's denial of injunctive relief ignores the standard of "reasonable accuracy and sufficient legal certainty" required for compensation in money damages. We realize that, were we to utilize strict judicial restraint, we would not reach this issue of the calculability of losses because we have held there is no manifest error in the finding that Pogo's reservoirs are not sustaining losses due to United's low takes of gas. Nonetheless, because the Commissioner's report emphasized the findings on this issue and because the parties have forcefully urged that we consider it, we will briefly discuss it.
The Commissioner's report stated that, "any injury to plaintiff's reservoirs can definitely be calculated and therefore can be compensated by money damages." Pogo recognizes that all of the experts testified that the amount of additional lost gas, if any, can be calculated; it is the accuracy of the calculations which is disputed. Pogo asserts that it is not sufficient merely that a number can be assigned to its losses; more is required. Money damages may only be given where injuries can be calculated with some degree of accuracy, and Pogo asserts that the accuracy testified to by the experts in this case is not sufficient. Hence, injunctive relief is the appropriate remedy.
Pogo makes several points in support of this assertion but argues chiefly that the Commissioner's finding is not supported by the case law, citing Aladdin Oil Co. v. Rayburn Well Service, Inc., 202 So.2d 477 (La.App. 4th Cir.), writ denied, 251 La. 388, 391, 392, 204 So.2d 573-74 (La.1967); Breaux v. Pan American Petroleum Corp., 163 So.2d 406 (La.App. 3rd Cir.), writ denied 246 La. 581, 165 So.2d 481 (1964); and several recent federal and state district court cases. These cases, holding that injury to underground reserves cannot be accurately calculated and compensated by money damages, would indeed be persuasive were the issue purely legal. We believe, however, that the issue is one of fact, to be determined not by the holdings in other cases, but by the evidence which was before the Trial Court, and we therefore distinguish these cases for the same reason we distinguished the Sea Robin case above. We are not obliged to find manifest error in the Commissioner's findings that the injury in this case can be calculated and compensated in money damages merely because other courts, viewing different evidence, found to the contrary in other cases. Rather, we examine the evidence in this case to determine whether it supports the Trial Court's findings, and as explained above, we conclude that it does. Accordingly, we reject Pogo's argument based upon the evidentiary findings in other cases.
*818 Pogo's third assignment of error concerns the Commissioner's refusal to allow cross-examination of United's experts on documents which support Pogo's characterization of the drive mechanisms of six of the reservoirs. The documents, submitted to this Court by proffer, are MER (Maximum Efficient Rate) forms which the operator of the reservoirs routinely files with the federal government. Among other information included in each MER form is the operator's assessment of the reservoir's drive mechanism. United was allowed to place in evidence two MER forms as part of the documentation supporting the testimony of its expert, Wiggins. Then, on cross-examination of Wiggins, the Commissioner would not permit Pogo to impeach Wiggins by use of six other MER forms in which the operators' assessments of drive mechanism differed from that of Wiggins. The Commissioner's ruling was based on the rule against hearsay evidence and United's assertion that Pogo had withheld the MER forms from discovery. Both parties make cogent arguments on this issue. We nevertheless believe its determination is not required because the impact of the MER forms on the evidence as a whole would be miniscule; hence any error in the ruling was harmless.

POGO'S RIGHT TO SPECIFIC PERFORMANCE
In the claim for a mandatory preliminary injunction Pogo seeks essentially the same relief as it seeks in its amended petition for specific performance of the contracts. We, therefore, deem it necessary to point out that our present holding that Pogo is not entitled to a preliminary injunction is not determinative of Pogo's right to specific performance. In spite of this protracted litigation over the issue of irreparable harm, resolution of that issue does not end the matter. In J. Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896 (La.1981), the Supreme Court explained that the absence of irreparable injury is no bar to specific performance. "[W]e reject the common law view that the obligee must first clear the inadequacy of damage-irreparable injury hurdle before invoking the remedy [of specific performance]." 404 So.2d at 900. Hence, Pogo may indeed be entitled to specific performance of its contracts with United, C.C. art. 2462, even though the evidence of irreparable injury has been found lacking. See, for example, Superior Oil Co. v. Transco Energy Co., 616 F.Supp. 94 (W.D.La.1984), and on rehearing, 616 F.Supp. 98 (W.D.La.1985).
For the foregoing reasons, the judgment of the Trial Court is affirmed. Costs of this appeal to be assessed by the Trial Judge following a decision on the merits of the suit for specific performance.
AFFIRMED AND REMANDED.