554 So.2d 56 (1988)
Childs E. DUNBAR, Jr., Marine Vessels, Inc., on Behalf of Algiers Iron Works and Dry Dock Co., Inc.
v.
Thomas Sewell WILLIAMS, Mrs. Patricia Williams, Edgar W. Williams, Elmer P. Grundmeyer, Jr., D.D.S., and Mrs. Flora Belle B. Grundmeyer, et al.
No. CA-8330.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 1988.
On Rehearing May 9, 1989.
On Second Rehearing November 16, 1989.
*59 Charles K. Reasonover, Harry S. Anderson, Bernard Marcus, Deutsch, Kerrigan & Stiles, New Orleans, for plaintiffs-appellants.
Thomas R. Blum, Judy Perry Martinez, Charles C. Coffee, Denise Puente, Simon, Peragine, Smith & Redfearn, New Orleans, for defendants-appellees.
Before BARRY, ARMSTRONG and PLOTKIN, JJ.
BARRY, Judge.
The minority stockholders of Algiers Iron Works and Dry Dock Co., Inc. (AIW) brought this derivative suit against the majority stockholders to recover damages allegedly suffered over a ten-year period (1974-1984) by the corporation which is engaged in the repair of small vessels. Additionally, plaintiff Childs E. Dunbar, Jr. urges a claim for the wrongful termination of his employment from the corporation.
After thirty-two days of testimony the Commissioner recommended that defendant Thomas Sewell Williams be ordered to reimburse AIW $9,162.01 and that the suit be otherwise dismissed at plaintiffs' cost.
After a hearing on plaintiffs' exceptions to the recommendation, the district court entered judgment as recommended except that costs were assessed against the corporation. We note the district court did not adopt the commissioner's report. Only the plaintiffs have appealed.
As a preliminary matter, the plaintiffs contend they were entitled to a trial de novo by the district court. The trial judge is constitutionally required to make a de novo determination of the commissioner's factual findings and recommendation. Pogo Producing Co. v. United Gas Pipe Line Co., 511 So.2d 809 (La.App. 4th Cir. 1987), writ denied 514 So.2d 1164 (La.1987). We find no merit in plaintiffs' assertions that the requirement was not met because the commissioner did not cite any testimony by page number or because the commissioner did not relate the facts to legal principles.
The plaintiffs' primary claim is that the defendants, as directors and officers of AIW, breached their fiduciary duty as set forth in La.R.S. 12:91 which provides in pertinent part:

*60 Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions.
Plaintiffs, who collectively own 37% of AIW's stock, are Childs E. Dunbar, Jr.; his three sisters: Mrs. Bonnie Jean Bengston, Mrs. Merlyn D. O'Neill and Mrs. June D. Rosenthreter; and Marine Vessels, Inc., a corporation controlled by Dunbar. The plaintiffs owned their stock at all times relevant to this suit, except Marine Vessels which acquired its stock on March 17, 1980 after the death of William Umbach. Both AIW and Dunbar (on behalf of Marine Vessels) had bid on the Umbach stock.
Dunbar served on AIW's Board of Directors and as its vice president for about five years in the 1950's. He was a director from 1968-1979 and a fulltime employee and vice-president as of 1972. In 1979 he was not re-elected to the Board and in 1980 his employment was involuntarily terminated.
Defendants collectively own 63% of AIW's stock. They are Mr. and Mrs. Thomas Sewell Williams, Edgar Williams (Thomas Sewell Williams' brother), Dr. and Mrs. Elmer Grundmeyer, and the "Isaac" group which includes Ernest Danjean, Ronald Isaac and the now deceased Perrin Rittiner. As of 1972 the Williams family owned 47.4% and the Grundmeyer family owned 15.6% of the stock. Thomas Sewell Williams (Williams) became president of AIW in 1955.
In 1982 the Isaac group purchased 24% of AIW's stock from Williams, Edgar Williams and Dr. and Mrs. Grundmeyer. Pursuant to this sale almost all of the shares owned by the defendants were placed in a voting trust.
AIW's officers and board members during the relevant times were:
1974-1979
Williamsdirector and president
Edgar Williamsdirector and vice president
Dr. Grundmeyerdirector and vice president
Dunbardirector and vice president
Mrs. Grundmeyerdirector and secretary/treasurer
1979-1982
Williamsdirector and president
Mrs. Williamsdirector and vice president
Edgar Williamsdirector and vice president
Dr. Grundmeyerdirector and vice president
Mrs. Grundmeyerdirector and secretary/treasurer
1982-1984
Williamsdirector and president
Danjeandirector and vice president
Isaacdirector and vice president
Rittnerdirector and vice president
Dr. Grundmeyerdirector and secretary/treasurer
Plaintiffs' first specification of error is that certain defendants had business dealings with AIW which created an adverse interest to the corporation. The questioned transactions involve AIW's (1) purchase of cranes, (2) purchase of oil separators, (3) repairs and services to Williams' yacht Patty Jean, (4) hiring Dr. Grundmeyer as in-house dentist and (5) payment of allegedly unearned compensation and fringe benefits.
When there is a transaction between a corporation and one of its officers or directors, La.R.S. 12:84(A) sets guidelines to validate what otherwise might be a tainted dealing.
A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present *61 at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
1. The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
2. The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or
3. The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.
The questioned officer or director has the burden to establish that the transaction was fair and in good faith, essentially that it was at arms length. House of Campbell, Inc. v. Campbell, 172 So.2d 727 (La. App. 4th Cir.1965); Noe v. Roussel, 310 So.2d 806, 818-19 (La.1975). The Noe court explained:
[T]he agent or fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal....
Noe, 310 So.2d at 819.

THE CRANES
Tower Crane Company, owned by defendants Mr. and Mrs. Williams and Edgar Williams, was formed in 1971 after the purchase of its assets from AIW for one dollar. Tower was operated by Williams from 1972 to 1975 and semi-actively from 1975 to 1982. Tower came into existence after the Grundmeyers and Dunbar expressed their disapproval with AIW having a separate crane division.
Tower used AIW's phones, address, land for storage of cranes, some personnel, but did not pay AIW for those services. According to Williams, AIW performed machine work for Tower which was usually invoiced to and paid by Williams, though some work may not have been billed. Williams said the storage area used by Tower was not utilized by AIW except when its customers and neighbors occasionally stored property free of charge. AIW personnel testified that they attended to Tower's business secondarily and at least one AIW employee was paid by Tower.
In 1976 AIW purchased Tower crane # 1 for $50,000 minus a $10,000 trade-in on a Linden crane. A month or so later Tower sold the Linden crane for $25,000. Williams testified he did not have a buyer for the Linden crane when AIW traded it to Tower.
Tower had purchased crane # 1 two years earlier for approximately $61,600 plus several thousand dollars for delivery, and had rented it for $2,100$2,400 per month. A new crane would have cost AIW about $95,000.
According to Gideon Lee, defendants' expert, the price paid by AIW was fair and "a very good price" because the crane would keep its value. Lee said $10,000 was a reasonable trade-in value for the Linden crane.
AIW's Board of Directors did not consider the crane transaction. Williams testified that he purchased the crane, just as he had made other major purchases for AIW. Williams told Dr. Grundmeyer he was going to trade in the Linden crane and said he discussed the transaction with Dunbar. Mrs. Grundmeyer and Edgar Williams apparently were not consulted and Dunbar denied any knowledge.
Williams claims the Tower crane was suitable for AIW's yard layout, whereas the Linden crane could not service their customers. He discussed the transaction with AIW's production employees who allegedly agreed on the wisdom of the purchase.
*62 In 1979 AIW bought Tower crane # 2 for $45,000 which Tower had purchased for $40,000 between 1972 and 1974 and had rented twice. Lee testified the crane's market value was $50,000 and AIW made a very good deal.
AIW's 1985 financial statement indicates that AIW spent $331,426.37 to install crane # 2 on the barge Abbey. It was necessary to replace the barge's deck, add new floors, install a ballast pump system, replate and paint.
Plaintiffs contend crane # 2 was ill-suited for AIW because only heavy lift equipment was suitable. Dunbar testified that he had never seen a shipyard without a heavy lift crane. Williams testified that AIW rented heavy lift equipment because it was only required on a few jobs, whereas Tower cranes are suitable on all jobs. He said a Tower crane handles work faster with more efficiency and safety.
When Tower purchased crane # 1 it was financed by a demand loan from Whitney Bank which was secured by a mortgage on the equipment. Apparently Tower (Williams) did not have that mortgage or the mortgage on crane # 2 released when AIW bought the cranes, nor had Tower made any payments on the loans.
Williams testified he determined the market value of the cranes from the publication Construction Bargainers, but he did not keep the magazine. No independent appraisals were secured.
The two crane purchases by Williams (as President of AIW) from his company (Tower) were not authorized by AIW's Board, hence, both purchases fail the test of R.S. 12:84(A)(1), (2) and (3). However, the record supports the trial court's conclusion that the costs of both purchases were reasonable and their utility fit AIW's needs. We have no basis to conclude that the cost of either crane was inflated or that either transaction was improper. Despite Williams' breach of his fiduciary duty, the trial court apparently decided that he acted in good faith. On a de novo review we might question Williams' good faith, however, the record is insufficient to find manifest error.
However, the use of AIW's premises, services, and personnel by Tower was clearly improper. AIW received no payment or discernible benefit and Williams' actions on behalf of Tower violated his fiduciary duty to AIW. We likewise find Edgar Williams and Dr. and Mrs. Grundmeyer breached their fiduciary duty by failing to inquire. Unfortunately, the record does not permit a determination of the value of the benefits which Tower received.
We therefore remand for the trial court to conduct a hearing to determine the value of the various benefits and to enter a judgment in favor of AIW and against Williams, Edgar Williams and Dr. and Mrs. Grundmeyer, jointly and in solido.

THE OIL SEPARATORS
Williams owned a 33% interest in Cathay Trading Co. which was incorporated in May, 1981. Cathay is an agent of China Corporation of Shipbuilding Industry through its United States agent, Asian International, Ltd. Williams allegedly never received any monies via dividends, salary or bonuses from Cathay. Cathay had a phone at AIW's Belle Chase office from which Williams apparently operated Cathay.
In July, 1981 AIW bought from Cathay ten oil separators for $220,000 for which Cathay had paid $200,000. Cathay was able to finance its purchase of the separators from the sale to AIW, i.e., when AIW made payment, Cathay took its $20,000 profit and paid the balance to the seller. In December, 1984 AIW sold the separators for $10,000.
Williams got involved with Cathay with three others who had handled AIW's insurance for years. Williams testified that in 1981 the marine industry was prosperous and AIW did capacity business, so he sought other business ventures. He thought there would be a demand for oil separators since the price of oil was rising and Cathay could get exclusive rights to the separators. Williams planned to obtain retail rights for AIW and he attended trade shows and talked to one company about *63 becoming a distributor. He knew of separators similar to the ones Cathay sold which cost about $60,000 apiece retail. He also knew other companies had purchased separators identical to the ones Cathay sold to AIW, and one company was selling about ten smaller separators a week. According to Williams, Asian International told him it sold separators in New Orleans prior to Cathay's distributorship.
AIW did not vigorously market the separators pending resolution of problems with the availability of parts and liability insurance. An exclusive contract was never obtained because Asian did not have that power, contrary to their letter of intent. Williams continued to pursue exclusive rights but stopped when the oil market collapsed.
AIW's board never formally considered the oil separators deal. Dr. Grundmeyer said he approved the purchase because he felt AIW should take on the venture and would eventually make money. Mrs. Grundmeyer executed the note to finance the purchase. Edgar Williams apparently knew nothing about the transaction.
AIW recovered about 50% of its loss because of the tax write-off. Williams testified the tax savings was not the reason for selling for only $10,000. Rather, in 1984 the directors decided informally to get rid of the separators as fast as possible and did not seek an appraisal or another buyer.
We find that La.R.S. 12:84(A)(3) is applicable. At the time of the purchase(s) the price paid to Cathay was reasonable and the possibility of a successful venture looked promising. A majority of the uninterested directors informally ratified the transaction. The subsequent, unforeseeable economic downturn should not be used to second guess the wisdom of the transaction.
Nonetheless, Williams breached his duty to AIW by taking advantage of his position with AIW to generate a profit for Cathay. We find Williams liable to AIW for the $20,000 profit which Cathay received.

THE YACHT PATTY JEAN
Williams personally bought the Patty Jean for $5,000 in August or September, 1977, apparently in very poor condition. Williams testified that he informally told Dr. and Mrs. Grundmeyer and Edgar Williams that he intended to use the yacht to entertain customers and they approved. Williams did not discuss the matter with Dunbar, the other Board member.
The boat's exterior paint had to be stripped off two layers at a time, the cabin recanvassed and secured, the deck cleaned, the entire boat painted and varnished, and rotten wood replaced. Richard Lemoine testified that he and his father received $10 per hour to make the repairs. Williams testified the cost for labor and supplies was $4,320 and was paid by AIW. AIW also paid for annual and special dry dockings, fire damage repairs, gear overhauling, installation of a wooden deck overlay, and miscellaneous parts and gear.
Williams said the cost for annual and special dry docking services totalled $23,500 and was corroborated by Jack Oser, an AIW employee, and Robert C. Bunting, plaintiff's expert. Dunbar testified those services would cost between $59,000 and $70,000.
Williams estimated fire damage repairs at $3,000, the deck overlay $3,600, and gear overhauling $1,200. The miscellaneous parts and gear were estimated at $2,500.
Dunbar testified that the amount actually spent to refurbish, repair and maintain the yacht was between $142,500 and $157,500. The trial court adjusted all of Williams' estimates to reflect the costs to a regular customer and concluded the work should be valued at $43,303. We have no basis to find manifest error in that valuation.
As for the alleged benefits AIW received from the Patty Jean, twenty-one fishing trips were made entertaining approximately 152 people. Plaintiffs complain that not all of those trips were business related. Dunbar acknowledged the necessity for AIW to entertain, but maintained it would have been cheaper to charter a boat.
*64 Jack Faulkner, an expert on overnight charters in the Gulf Coast area, testified that the standard charter fee for a vessel similar to the Patty Jean for a three-day fishing trip would be $125 per person per day with a four person minimum (not including alcohol) or $1,500. According to Williams, a trip cost approximately $600 to $800 and he computed the value of all the trips at over $50,000.
We disagree that a promotional trip is not business related, or that a guest unrelated to the shipping industry constitutes nonbusiness usage. It appears that the value of the trips fairly approximates the expense incurred by AIW to repair the vessel.
We conclude there was no fiduciary breach by Williams or manifest error in the trial court's finding that use of the Patty Jean by AIW in exchange for repairs, maintenance and refurbishing was reasonable and carried out in good faith.

DENTAL PROGRAM
Lucien Moragas, AIW yard superintendent, suggested the establishment of a company dental plan to improve employee retention. After reviewing other plans, in May, 1980 AIW's board voted unanimously to employ Dr. Grundmeyer (while a Board member) as an in-house dentist. There is no question that the directors knew of Dr. Grundmeyer's interest in his selection.
Prior to that decision, AIW paid Dr. Grundmeyer $14,400 annually as a part-time employee. His salary was $54,000 after being hired as the company dentist. AIW expended $46,000 for his office and equipment, part of which was for dental equipment owned by Dr. Grundmeyer and valued between $15,000 and $20,000 and sold to AIW for $7,500. Until September, 1983 AIW had a part-time dental assistant who was also the company receptionist.
When the board approved the dental program, AIW had approximately 125 employees making about 350 family members eligible. A proposal by Pilot Life Insurance would have cost between $42,984 and $50,562 depending on the deductible. Pilot's plan included a 50% coverage for orthodontics with a lifetime maximum of $1,000, with other maximum annual benefits of $1,000. Exclusions included charges on account of occupational injuries or sickness. Pan American Life also submitted a plan.
The in-house plan did not have a deductible, nor did it limit coverage by dollar amount or non-occupational injuries or sickness. It did not include orthodontic work. Several employees testified as to the benefits in terms of increased morale and improved employee retention.
Dr. Grundmeyer spent more time on the premises and was available for administrative duties, including the worker's compensation program. He served as a director and vice president through 1982 and director and secretary treasurer since 1982. He participated in daily management as well as weekly staff meetings.
We recognize that an in-house dental program is not an ordinary way to provide employee coverage. The evidence indicates that Pilot's proposal and the in-house plan had advantages and disadvantages which are not comparable. The Board had the discretion to choose which plan was most advantageous. A plus for in-house was having Dr. Grundmeyer available for other duties.
Plaintiffs point to the decrease in AIW's employees which they claim is further proof that the plan was extravagant. We note La.R.S. 12:84(A)(3) requires fairness "as of the time it was authorized, approved or ratified."
We find sufficient evidence to conclude that the dental program was fair when it was approved by AIW's Board.

UNEARNED COMPENSATION AND FRINGE BENEFITS
Plaintiffs claim the defendants breached their fiduciary duties by giving themselves unearned compensation in the form of excessive salaries and fringe benefits.
La.R.S. 12:41(B)(9) provides in pertinent part:

*65 B. Without limiting the grant of power contained in Subsection A of this Section, it is hereby specifically provided that every corporation shall have authority:
* * * * * *
(9)(a) To elect or appoint officers and agents;
(b) To define their duties;
(c) To fix their compensation;
(d) To pay pensions and establish pension plans, pension trusts, profit sharing plans, and other incentive and benefit plans for any or all of its directors, officers, and employees; and

* * * * * *
Mr. and Mrs. Williams
Williams' salary was not challenged by plaintiffs on appeal, however, certain fringe benefits are questioned. Mrs. Williams served as a director and vice president from 1979 to 1982 after the removal of Dunbar. She worked on accounts payable vouchers, signed corporate documents and checks, and attended board meetings. Her compensation was $600 per month in 1979 which was raised commensurately with Mrs. Grundmeyer's.
Mrs. Grundmeyer
Mrs. Grundmeyer was a director and officer of AIW for 27 years from 1955 through 1982. She signed checks and reconciled AIW's payments with the accounts payable records. As a director she participated in Board meetings between 1974 and 1982.
From 1974-1977 Mrs. Grundmeyer's compensation was $300 per month which was raised to $600 in 1977. In 1980 and 1981 she and all other salaried employees received a 10% raise. She has received $300 per month as retirement pay since November 1982.
Dr. Grundmeyer
Dr. Grundmeyer's compensation from 1980 to trial, as company dentist, is covered above.
From 1974-1980 Dr. Grundmeyer served as a director and vice president. He was involved in AIW's business development and customer relations, including entertaining customers. He had administrative responsibilities and worked with Williams. Dr. Grundmeyer received $1200 per month which increased to $1500 per month in 1979.
Edgar Williams
Edgar Williams served as a director and vice president from 1974-1982 and attended all but two of the board meetings. He is an industrial engineer. He worked previously with a shipbuilding company in their vessel design department. He consulted with AIW personnel, particularly his brother, and reviewed AIW's plans for putting in the tower crane and the warehouse expansion. From 1974 to 1977 he received $300 per month, from 1977 to 1979 $600 per month, and in 1979 his salary was increased to $1200 per month. His salary was terminated in 1982 when he was no longer an officer.
The Isaac group
The three members of the Isaac group served as directors and vice presidents from 1982 through 1984. All participated in board meetings which became monthly around August 1983, as well as weekly staff meetings.
Rittner had been in the equipment and convenience store business. Danjean had been in the food and grocery business. Isaac was an accountant, past chairman of Gulf South Bank, and served as vice president and treasurer of Louisiana Gas Service. Allegedly they brought experience, solicited business, and entertained customers.
Isaac testified that he got involved in AIW's financial matters, including accounting and bookkeeping procedures and tax planning. He gradually took over the duties of comptroller. Williams and Oser described the three men as active directors.
Each received $2,000 per month which was based on one-third of their time on AIW business. $2,000 represented one-third the amount paid to Williams. When Isaac began full time his salary was raised to $4,000 per month and in January 1985 to $5,000 per month.
*66 The salaries of Mrs. Grundmeyer, Mrs. Williams, Dr. Grundmeyer, Edgar Williams and the Isaac group were all approved by the Board. We have no basis to question the salaries or the services rendered and find no breach of their fiduciary duties.
Linda Williams
Linda Williams, daughter of Mr. and Mrs. Williams, was hired fulltime in September, 1980 for $14,400 as a clerk/secretary. Apparently she was hired by her father and she worked for three years. She answered the phone and did general clerical work. Bob Reaves, AIW's office manager, and Moragas confirmed her duties. She did not replace anyone when she was hired nor was she replaced when she left.
There is no reason to conclude her employment was unfair or lacked good faith.

FRINGE BENEFITS
The questioned benefits are (a) American Express charges (b) gas charges (c) charges at service stations, restaurants and food stores (d) company cars (e) home phone bills (f) Grundmeyer's country club bills and Williams' carnival club dues.[1]
Plaintiffs contend those personal expenses were paid by AIW and are not business related, and the failure to keep records as to the business purpose constitutes a fiduciary breach. There is no question that AIW paid the expenses and the defendants must show their connection to AIW's business.
Mr. and Mrs. Williams, according to two ledger sheets in evidence, charged $17,583.97 on an AIW American Express account from February 1980 through August 1985. Of that amount Williams admitted $4,571.45 was not business related. As to gasoline charges from 1980 to 1984, Williams admitted that he or his family charged $4,590.56 which was not business related. The trial court judgment against Williams for $9,162.01, reflecting those two sums, was not appealed and is final.
As to the other fringe benefits, the commissioner concluded that Marine Vessels could not complain because it did not own any shares at the time of the alleged breach and Dunbar was estopped from complaining because he had participated in, ratified, or acquiesced in those benefits. The commissioner also concluded that the other plaintiffs, Dunbar's sisters, were estopped because Dunbar's actions were imputed to them since he had been "looking out" for their interest. There was no proxy executed by the sisters. Assuming, arguendo, that Dunbar may be estopped from complaining, we cannot agree that the three sisters would be estopped.
The commissioner found that the contested claims on the American Express and gasoline charges were speculative. No findings were made as to the other charges and the other defendants or the time prior to 1980. We note that Dr. Grundmeyer was questioned on receipts which allegedly documented the business purpose of his charges, but the receipts were not introduced into evidence. Likewise, there was testimony that Isaac kept detailed records documenting the business purpose of his charges but they are not in evidence. The record contains generalized statements regarding the other defendants' charges without any indication of their business nature.
Similarly, testimony established that company cars and home telephones were used for business and personal purposes. The record does not show how much was allocated for each purpose.
As to all of the defendants' claimed fringe benefits, the record is confusing and incomplete. Therefore, we must remand to the district court to determine what amounts, if any, were personal charges paid by AIW and if appropriate, to enter a judgment in favor of AIW for reimbursement from the benefiting defendant(s).
As for Williams' carnival club dues, Otto Candies, a local businessman, *67 testified for the defense that he considered then to be legitimate business expenses. Blaine Kern, also a local businessman, testified that a substantial part of the Krewe of Alla's memberships were paid by corporations primarily in the oil, gas, and marine industry, while Bacchus was comprised of other types of businesses.
Carnival dues are not, ipso facto, business related. Nor is there proof that Williams' membership in a carnival organization produced any revenue to AIW. The record and briefs are unclear as to which organizations Williams belonged to and at what costs to AIW.
We remand to the trial court to determine the amounts paid by AIW for carnival club dues and to enter the appropriate judgment in favor of AIW and against Williams.
We next consider AIW's payments to Timberlane Country Club for Dr. Grundmeyer. Beginning in 1972 AIW paid half of Dr. Grundmeyer's monthly dues to Timberlane as well as fees and services. The total paid by AIW was approximately $27,000 from September 1976 through August 1985.
Williams testified that an agreement was made between Dunbar, Dr. Grundmeyer and himself for AIW to pay one-half of the dues and charges that Dr. Grundmeyer submitted. Dr. Grundmeyer testified AIW only paid that portion of the Timberlane bill which was business related. There are no specifics.
The defendants have not discharged their burden of establishing which charges were business related. A generalized statement by the interested party that an expenditure was business related is insufficient. The various payments in the record do not indicate which portion relates to dues.
Thus, we must remand for a determination of the dues and non-business related charges paid for by AIW to Timberlane for the relevant period of time and for the trial court to enter a judgment in favor of AIW and against Dr. Grundmeyer for reimbursement.
Plaintiffs next specify error in the failure to find a fiduciary breach in (1) the batture building construction, (2) opening the Belle Chasse office and (3) establishment of a voting trust.

BUILDINGS ON THE BATTURE
AIW was formed in 1924 by the merger of Algiers Iron Works, Ltd. and Algiers Dry Dock & Ship Repair Co., Inc. In 1924 its facility consisted of a floating drydock moored at the Powder Street Wharf. The wharf had been built by the company's predecessor (Algiers Dry Dock) for the benefit of the New Orleans Dock Board and leased from them under a "first call" assignment. AIW, and its predecessors, has had uninterrupted use of the wharf since it was built. In the 1960's a large portion of the batture was filled and AIW built a fabrication shop. In 1979 AIW constructed a warehouse and tool room adjacent to the fabrication shop. In 1980 operations offices were constructed on the batture and in 1983 executive offices were built atop the warehouse. AIW does not own the batture.
The structures cost approximately half a million dollars and were built without board approval. Plaintiffs complain that the construction (since 1979) was paid out of current profits to avoid paying dividends. They urge AIW should have used long term financing and not increase its loan by $325,000 at the Whitney National Bank in order to pay taxes due in April, 1981.
Moragas testified that he was hired to increase business after a dropoff in 1979 and he pressured Williams to construct the buildings. He, Isaac and Williams testified regarding the increased efficiency from consolidation of operations. According to Williams, AIW did not suffer losses during the economic downturn because of the increased efficiency. Transportation of materials was minimized, storage was consolidated, and maintenance needs were reduced because the new buildings were adjacent to the fabrication shop and near the wharf, within the range of the dry dock cranes. Williams attributed AIW's record *68 profits in 1980 directly to the construction of the warehouse. He said it enabled the yard to obtain a large tugboat job because AIW could do the job cheaper on a time and materials basis.
Plaintiffs do not dispute the soundness of placing the buildings close to the wharf and adjacent to the fabrication shop. Their complaint is paying cash versus long term financing.
Jerry Brectel, C.P.A., an expert in auditing and small business consulting, testified based on his ten years experience with AIW. He said AIW was a very conservative company and extremely reluctant to borrow money. Thus, the decision to fund the construction out of current earnings was in keeping with AIW's usual practice.
We note AIW's right to use the land has never been questioned. According to Williams, the Dock Board attorney told Williams that AIW probably owned the land. Williams was satisfied that any doubt was resolved by AIW's acquisition of the so-called railroad property in the early 1970's because its owner would have been the only possible challenger to AIW's rights. The record does not clarify how purchase of the railroad property might resolve use of the batture.
AIW's board did not approve construction of the buildings. The lack of that formality, not a legal necessity, does not negate the validity of the decision to build. The record shows that the construction was a good decision, possibly preventing otherwise disastrous effects from the economy.

BELLE CHASE OFFICE
Plaintiffs urge that the defendants breached their fiduciary duties by moving AIW's registered office from Orleans to Plaquemines Parish from September or October, 1980 through August 1983 at a cost of $32,000. They contend the move was in anticipation of Dunbar filing suit and Williams' belief that he would receive political and judicial favoritism in the new venue. Apparently the possible suit concerned the fact that AIW and Dunbar bid on the Umbach stock. A suit by the Umbach heirs did follow the purchase by Dunbar, but it was eventually resolved in favor of Dunbar. Dunbar notes that the change in domicile was approved just after judgment was rendered in his favor; however, it is unclear how that is linked to changing the corporation's venue.
While there is testimony indicating that Williams articulated a personal reason for the move, no suit was filed and Dunbar does not establish that the AIW board would have any reason to think one would be filed. Importantly, we note substantial testimony regarding the business purpose of placing an office in Belle Chase.
On May 19, 1980 AIW's board authorized an office in Belle Chase and establishment of the corporate domicile there. All of the directors testified that their intent was to facilitate expansion of the company's facilities. At the August 2, 1983 board meeting it was decided to close the office due to the economic climate.
Williams testified that expansion had been contemplated for years and a move to Plaquemines Parish was agreed on because of the available riverfront, water depth, and proximity to the existing yard and the mouth of the Mississippi. He also felt Plaquemines would be more hospitable to AIW's plans if it was a local company. Isaac, before board authorization and his association with AIW, investigated suitable locations and procedures and spoke to Plaquemines Parish officials.
Other actions taken after the Belle Chase office was opened support the defendants' testimony. Surveyors prepared drawings of the river's configuration and depth. Outside investor interest was pursued and plans for the facility were prepared.
The evidence convinces us that AIW's Board decided to open the new office as the first step of their expansion plans, but the economy's downturn made further action unfeasible. We find the defendants did not breach their fiduciary duty.

VOTING TRUST
Plaintiffs urge two separate breaches of duty regarding the formation of defendants' voting trust. First, plaintiffs *69 appear to allege that the Isaac group's desire to purchase AIW stock was an opportunity for the corporation to sell its authorized but unissued shares and would have generated cash to pay an outstanding loan. Instead, the defendants sold their shares and created the voting trust. Plaintiffs also urge that the minority shareholders should have been given the opportunity to participate in the stock sale.
We find no merit in plaintiffs' arguments. Their position would require corporate fiduciaries to refrain from selling their stock whenever the corporation had authorized but unissued shares, and to sell their own stock only after making sure minority shareholders did not want to sell.
Next, plaintiffs urge that the defendants breached their fiduciary duty by establishing the voting trust. They contend they are "frozen out" because Mr. and Mrs. Williams, Dr. and Mrs. Grundmeyer and Edgar Williams received $750,000 collectively in exchange for giving 24% ownership of AIW and control to the Isaac group.
La.R.S. 12:78, relevant to voting trusts, provides in pertinent part:
A. Two or more shareholders of a corporation may, pursuant to an agreement in writing, transfer their shares to any one or more persons or corporations having authority to act as trustees, for the purpose of vesting in the transferees, as trustees, for a period not exceeding fifteen years and upon the terms and conditions stated in the agreement, all voting or other rights pertaining to such shares.
The purpose of a voting trust is to allow shareholders to insure the continuation of control by the transfer. The Isaac group's purchase of the shares, plus the subsequent voting trust agreement, perpetuates and solidifies the majority's control and adds three shareholders to the group which wields that control.
We find no manifest error in the finding that the establishment of the voting trust did not breach the fiduciary duty.
Lastly, Dunbar specifies error in failing to find a fiduciary breach in the termination of his employment with AIW.

DUNBAR'S TERMINATION
At the October 31, 1979 shareholder's meeting Dunbar was not re-elected as an AIW director and lost his position as an AIW vice president at approximately $36,000 per year. Dunbar was rehired the next day with different duties, but on October 2, 1980, the board voted to terminate his employment. Dunbar did not allege an employment contract.
Dunbar urges defendants breached their fiduciary duty and deprived him of any financial return on his AIW stock. Under Louisiana law an employee may be terminated at will unless that employee has an employment contract covering a certain period of time or is otherwise statutorily or constitutionally protected from termination. La.C.C. Art. 2747. See Gil v. Metal Service Corp., 412 So.2d 706 (La.App. 4th Cir.1982), writ denied 414 So.2d 379 (La.1982). Dunbar's allegation that his termination was without cause is irrelevant.
We note that some states protect minority shareholders in closely held corporations from termination without cause. See Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 353 N.E.2d 657 (1976); Notzke v. Art Gallery, Inc., 84 Ill.App.3d 294, 39 Ill.Dec. 860, 405 N.E.2d 839 (1980); O'Neill, Oppression of Minority Shareholders, § 2.06, 2nd ed. (1985 & Supp.1987).
Nonetheless, under Louisiana law, Dunbar does not state a cause of action because of his termination.
IT IS ORDERED:
The judgment of the district court relative to the Cathay oil separators is reversed and there is judgment in favor of Algiers Iron Works and Dry Dock Co., Inc., and against Thomas Sewell Williams in the sum of TWENTY THOUSAND DOLLARS ($20,000) with legal interest from the date of judicial demand.
The judgment of the district court relative to the Tower crane transactions is reversed. Plaintiffs claim is remanded for a determination of the value of the services rendered by Algiers Iron Works and Dry *70 Dock Co., Inc., to Tower and for entry of a judgment in favor of Algiers Iron Works and Dry Dock Co., Inc., and against Thomas Sewell Williams, Edgar A. Williams, Elmer P. Grundmeyer, Jr., D.D.S., and Mrs. Flora Belle B. Grundmeyer, jointly and in solido.
The judgment of the district court in favor of Thomas Sewell Williams, Mrs. Patricia Williams, Edgar A. Williams, Elmer P. Grundmeyer, Jr., D.D.S., Mrs. Flora Belle B. Grundmeyer, Ronald Isaac, Perrin Rittiner and Ernest Danjean relative to their personal charges and fringe benefits which were paid by Algiers Iron Works and Dry Dock Co., Inc. is reversed. Plaintiffs' claims are remanded for a determination of the value of the personal charges/fringe benefits as discussed above, and for entry of an appropriate judgment in favor of Algiers Iron Works and Dry Dock Co., Inc.
In all other respects the judgment of the district court is affirmed.
REVERSED IN PART; AFFIRMED IN PART; REMANDED IN PART.
PLOTKIN, J., dissents in part and concurs in part, with written reasons.
PLOTKIN, Judge, dissenting in part and concurring in part, with written reasons.
I respectfully dissent in part.
Interpretation of Louisiana's interested officer and director statutes and those dealing with the fiduciary duties owed by officers and directors to the corporation and its shareholders, LSA-R.S. 12:84 and R.S. 12:91, is at issue in this case.
Plaintiffs, minority shareholders of Algiers Ironworks & Dry Dock Co. Inc. (AIW), brought this derivative action against the defendants, the majority shareholders, to recover damages suffered as a result of self-dealing and breaches of fiduciary duties from 1974 to 1984. The majority shareholders were the corporate officers and directors.
Plaintiffs complain of two types of malfeasance. The first class of claims involves actions in which the defendants, usually Thomas A. Williams, the president/director, allegedly had a personal interest or received a personal gain as the result of a non-authorized corporate transaction, in violation of LSA-R.S. 12:84. The second group of claims involves actions which the plaintiffs claim were taken by the defendants in violation of LSA-R.S. 12:91, which breached their fiduciary duties owed to the corporation.
Plaintiff Childs E. Dunbar Jr. further claims damages for wrongful discharge from AIW.

Transactions Between Directors-Officers and the Corporation
Plaintiffs claim that Williams received personal benefits and profits when he sold Tower cranes and oil separators to AIW and that he personally realized the proceeds and use of funds AIW expended to repair and maintain his personal yacht. Plaintiffs claim that Dr. Grundmeyer, a director-officer, received improper unearned excessive compensation and fringe benefits as AIW's in-house dentist.
Louisiana law imposes upon corporate officers and directors a fiduciary duty to the corporation and its shareholders when an officer or director contracts with the corporation. The transaction is subject to close judicial scrutiny to ensure that no violation of fiduciary duty is involved. Groves v. Rosemound Improvement Ass'n. Inc., 490 So.2d 348 (La.App. 1st Cir.), writ denied, 495 So.2d 304 (La.1986).
The authority to act on behalf of a corporation can only be conferred by the charter or bylaws of the corporation or by resolution of the board of directors. McKendall v. Williams, 467 So.2d 1301 (La.App. 4th Cir.1985). The office of president in itself confers no power to bind the corporation or control its property. Fluidair Products Inc. v. Robeline-Marthaville Water System, 465 So.2d 969 (La.App. 3d Cir.1985).
The person acting in the fiduciary capacity bears the burden of establishing that his transactions were legitimate. Normat Industries Inc. v. Carter, 477 So.2d 783 (La. App. 5th Cir.1985). By law, the interested director must show not only that the action *71 was fair to the corporation, but also that it was essentially an "arms length" transaction. Quartana v. Jenks, 436 So.2d 1335, 1337 (La.App. 5th Cir.), writ denied 441 So.2d 1224 (La.1983); House of Campbell v. Campbell, 172 So.2d 727 (La.App. 4th Cir.1965).
The law governing transactions in which an officer or director has a personal interest, upon which the majority relies, is LSA-R.S. 12:84. It unequivocally establishes the criteria for voiding a contract or transaction when the director engages in self-dealing. It states, in pertinent part, as follows:
A. No contract or transaction between a corporation and one or more of its directors or officers ..., shall be void or voidable solely for this reason, or solely because the ... interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or
(3) The contract or transaction was fair to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.

(Emphasis added.)
The clear purpose of this statute is to regulate transactions between a corporation and any other business where common or interested directors or officers are involved. Woodstock Enterprises Inc. v. International Moorings & Marine, Inc., 524 So.2d 1313 (La.App. 3d Cir.1988).
This interested director statute provides three tests which may validate a transaction. Subsection A(1) requires that the interested director or officer fully disclose material facts and that the board of directors in good faith authorize the contract or transaction without counting the vote of the interested party or director. Subsection A(2) is similar to A(1) except it requires approval of the shareholders. Subsection A(3) requires a showing that the contract or transaction was fair to the corporation at the time it was authorized, approved or ratified by the board of directors, committee or members. (Emphasis added.)
Therefore, authorization, approval and ratification by the Board, committee or shareholders is necessary under all three sections of the statute. The defendants admit that they lacked the formal board or shareholder approval for the purchase of the cranes and oil separators, and for the payment of the yacht expenses. Absent proof of formal approval of the actions, this court should not even consider the question of whether the transactions were fair to the corporation. When considering situations involving directors who have conflicts of interest under the third subsection of the above statute, courts should make a dual inquiry. First, the court should ask: Was the action formally approved by the board of directors or stockholders of the corporation? If the answer to the first question is "yes," and only if the answer is "yes," the court should then ask: Was the transaction fair to the corporation? Since the answer to the first question is "no" in the instant case, the transaction should automatically be voidable.
Additionally, I find no authority for the doctrine of "informal" corporate ratification, applied by the majority. The fact that the plaintiffs knew about the purchases does not mean that they approved them, as the majority indicates. The defendants cite McCarty v. Panzico, 467 So.2d 1229 (La.App. 2d Cir.1985) for the proposition *72 that tacit approval of a transaction is sufficient to fulfill the requirements of LSA-R.S. 12:84. In that case, the Second Circuit approved a corporate president's act of accepting stock in partial payment of a debt, saying that the president had apparent authority to take that action and that the "governing authorities" of the corporation may ratify an action "by implication ... provided the action was not prohibited by the corporation's charter, by statute, or is not contrary to public policy." Id. at 1234. (Emphasis added.) However, the doctrine of tacit or implicit ratification is highly restrictive and subject to strict judicial scrutiny. It should not have been applied in the instant case for several reasons.
By the strict terms of the McCarty case, implicit ratification may be applied to approve the actions of a corporate officer or director only when the action involved is not "prohibited by the corporation's charter, by statute, or is not contrary to public policy." Id. Williams' contested actions in the instant case fail two of those three tests.
LSA-R.S. 12:84 specifically restricts a corporate officer or director from taking any action which might result in a personal benefit without the express formal approval of the board, committee or the shareholders. Therefore, Williams' unilateral approval of the purchase of the oil separators was prohibited by statute.
Additionally, Williams' actions were contrary to public policy. The highest level of fidelity is required of corporate officers and directors and the law is designed to promote that fidelity and to protect the public interest. Therefore, Williams' actions in the instant case are doubly ineligible for approval based on the tacit or implicit ratification doctrine established in McCarty.
Purchase of Tower Cranes
The majority correctly concludes that the purchase of two cranes from Tower Crane Co. by Williams was not authorized, approved or ratified by AIW's board of directors, committee or shareholders. This transaction therefore unequivocally violates the test of LSA-R.S. 12:84(A)(1), (2) and (3).
The majority also validly concludes that the use of AIW's premises, services and personnel by Tower was improper and that Williams violated his fiduciary duty to the corporation. They remand for a determination of the value of these benefits.
I disagree with their conclusion that the purchases were nonetheless acceptable because "the costs of both purchases were reasonable and their utility fit AIW's needs." As stated above, this unsupported precept is not the standard for valid director-officer self-dealing with the corporation as established in LSA-R.S. 12:84. There is no justification in law for approving of corporate self-dealing based on the reasonable needs of the corporation. This principle, if accepted, would create an unworkable rule for interested director transactions. It would eliminate the requirement of approval or ratification, which is the cornerstone of valid interested director transactions. Furthermore, it would dilute and nullify the good faith fairness and full disclosure requirement established in LSA-R.S. 12:91. Noe v. Roussel, 310 So.2d 806 (La.1975).
For the above cited reasons, I would hold that Williams should reimburse the corporation $110,000 for the profits he received from the sale of the cranes to AIW. By my calculations, Tower earned $65,000 on the sale of Crane # 1the $50,000 sale price plus the $15,000 profit it earned on the sale of the trade-in, plus $45,000 from the sale of Crane # 2, for a total of 110,000. I concur with the majority's decision to remand to the trial court to determine the value of the benefits Tower received from use of AIW's premises, services and personnel.
Purchase of the Oil Separators
Regarding the oil separators, the majority finds that "Williams breached his fiduciary duty to AIW by taking advantage of his position with AIW to generate a profit for Cathay," a corporation in which Williams owned a 33 percent interest. They ordered Williams to repay the $20,000 profit earned on the transaction.
*73 However, for the reasons cited above, the majority misinterpreted LSA-R.S. 12:84(A)(3), when it approved the transaction on the basis that the purchase price paid to Cathay was reasonable and a majority of uninterested directors informally ratified the transaction.[1]
LSA-R.S. 12:84 requires formal board, committee or shareholder approval, which was never obtained. The reasonableness of the purchase is irrelevant. Therefore, the plaintiffs are entitled to recover for this unauthorized transaction.
For these reasons, I concur in the majority's decision that Williams should reimburse the plaintiffs the $20,000 received by Cathay.
Use of the Yacht
Williams purchased his personal yacht Patty Jean for $5,000. Thereafter, without corporate approval, he authorized and caused AIW to pay for all repairs, refurbishing and renovating expenses, maintenance, and annual and special docking fees.[2] None of these expenses were approved or ratified by AIW's board or the shareholders.
The majority correctly finds that a promotional trip is not business related and use of the yacht to entertain guests unrelated to the shipping industry constitutes non-business usage. However, they incongruously conclude that Williams did not breach his fiduciary duty because the value of the trips equalled the costs to AIW.
Again, there is no legal support for this opinion in either LSA-R.S. 12:84 or LSA-R.S. 12:91 or any of the cases cited by the majority. Louisiana corporate law does not confer power on a corporate president to expend corporate funds on personal property, merely by virtue of his office. In the absence of bylaws or a resolution of the board of directors, LSA-R.S. 12:84 applies, requiring corporate authorization. Williams should therefore be held liable for the expenses of maintaining his personal yacht.
For the reasons stated above, I would require Williams to reimburse the plaintiffs the sum of $43,303 for maintaining the yacht, as found by the trial court.
I would also note that I find that the record evidence insufficient to establish even that a majority of the directors were aware of the three actions enumerated above. However, assuming that the majority is correct on that point, I would still find that the actions were improper under the relevant statutes. In the first place, generally directors have authority to act as a board only at regularly scheduled meetings. New Founded Industrial Missionary Baptist Ass'n v. Anderson, 49 So.2d 342 (La.App.Orl.Cir.1950). Additionally, Williams failed to meet his burden of proving that the actions were legitimate. Williams did not present sufficient proof that the purchase of the cranes and the oil separators and the repairs and maintenance of the yacht were arms length transactions. In fact, the record indicates otherwise. There is no evidence that Williams considered undertaking the purchases from companies other than the ones with which he was affiliated.
The hiring of Dr. Grundmeyer as in-house dentist and the allegedly unearned compensation and fringe benefits were approved by the board of AIW. Additionally, it is obvious that the board was aware of the interests of the subject directors when those transactions were approved. Therefore, under LSA-R.S. 12:84(A)(1), those transactions are acceptable. I have no quarrel with the majority's conclusion on those issues.

Transactions Which Allegedly Breached Officer Fiduciary Duty to the Corporation
Plaintiffs claim that the defendants breached their fiduciary duties to AIW and the shareholders under LSA-R.S. 12:91 in three instances. They specifically allege that Williams improperly authorized $500,000 *74 worth of construction on property not owned by the corporation, that the majority improperly opened an office in Belle Chasse and that the majority improperly formed a voters' trust in an effort to "squeeze out" the minority.
Louisiana law imposes on corporate officers and directors a fiduciary duty to the corporation and its shareholders, in LSA-R.S. 12:91, which provides, in pertinent part, as follows:
Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions.
Louisiana courts interpreting the above provision have held that persons who have fiduciary duties "may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights" of the person or entity to which they owe that duty. Noe v. Roussel, supra.
Construction of Buildings on Batture
AIW constructed a warehouse, toolroom, operations office and executive offices on the batture for the approximate sum of $500,000. AIW does not own the property. All of these improvements were accomplished without board or shareholder approval.
Major construction projects, such as these, normally require board or shareholder approval. Williams breached his fiduciary duties to AIW when he authorized $500,000 worth of construction from current profits. My conclusion is based on the principle that a corporation president, even a president who also acts as a general manager, lacks the authority to take such actions on his own, without seeking board approval. McKendall, supra, and Fluidair Products Inc., supra. Williams' decision, made without board approval, was a breach of his fiduciary duties under LSA-R.S. 12:91, because it did not evidence "that diligence, care, judgment and skill which ordinary men would exercise under similar circumstances in like positions." Corporation presidents, under Louisiana law, are required to present and secure board or shareholder approval before engaging in major or substantial building projects.
I disagree with the majority's reasoning that the construction was justified because it was a good economic decision. The analysis should focus on whether the officer breached his fiduciary duty to the corporation. Once the breach is proven, then the question of the benefits to the corporation should be addressed only in considering the damage issue.
The evidence demonstrates that the improvements were invaluable to the corporation and enhanced the value of the stock. Therefore, the plaintiffs and the corporation suffered no damages and are not entitled to any recovery for these expenditures.
Opening of the Belle Chasse Office
Since the opening of the Belle Chasse office was approved by the board of directors of AIW, the above analysis does not apply to that action. Despite the plaintiffs' contention that the move was undertaken to force them to file their suit in Plaquemines, rather than Orleans, Parish, there is no clear evidence that the action was taken in breach of a fiduciary duty owed by any of the defendants. Therefore, I would find that action proper, even though it turned out to be unbeneficial to the corporation.
Formation of the Voting Trust
There is no evidence that the defendants breached any fiduciary duties in forming the voting trust. In brief, the plaintiffs allege that the trust represented an attempt to "freeze out" the minority. However, even under the cases cited by the plaintiffs, a "freeze out" occurs when the majority seeks to reduce or eliminate the minority's interest. The minority's interests were not affected by the formation of the voting trust in this case. Therefore, I agree with the majority that the plaintiff's arguments on this issue have no merit.

*75 Miscellaneous Issues

I concur with the majority that the salaries of Dr. and Mrs. Grundmeyer, Mr. and Mrs. Williams and Edgar Williams were board approved and with the authority of LSA-R.S. 12:41(B)(9). Regarding the fringe benefits, I agree with the trial court that Williams should repay the company the $9,162.01 which he admitted were personal charges. I also concur with the majority that the other benefits, charges to AIW for company cars, gasoline, home telephones, carnival club dues and country club dues and charges, should be repaid. The record clearly demonstrates that these fringe benefits were for the defendants' personal use and not company business. The acts violated the fiduciary duties owed to the corporation under LSA-R.S. 12:91. Since the value of the benefits cannot be determined by the record as it stands, the majority correctly remands to the trial court to determine the value of the benefits.
The majority concludes that Dunbar has no cause of action under Louisiana law to challenge his termination from the corporation because he may be terminated at will without an employment contract. Although I agree that this is true under existing Louisiana caselaw, the current national trend is to protect employees from discharge based on arbitrary reasons and without just cause. I feel that following that trend might be appropriate under the egregious circumstances of the instant case, because it is clear that Dunbar was discharged by the majority because he disagreed with their policies.
I agree with the plaintiffs that they are constitutionally entitled to de novo review of the trial transcript under Pogo Producing Co. v. United Gas Pipe Line Co., 511 So.2d 809 (La.App. 4th Cir.), writ denied 514 So.2d 1164 (La.1987). However, as the majority points out, the plaintiffs failed to show that the transcript was not properly reviewed. The fact that the commissioner failed to cite testimony by page number and the fact that the commissioner did not relate the facts to legal principles is not evidence of the action taken by the district court during its review of the record. Therefore, there is no reason for this court to refer the case back to the lower court for that reason.
For the reasons cited above, I would reverse the decision of the trial court concerning the purchase of the Tower Cranes, and would require Williams reimburse the company the $110,000 profit Tower earned on those transactions. I concur with the majority's decision that Williams should reimburse AIW the $20,000 profit Cathay earned on the sale of the oil separators. I would require that that Williams reimburse the company $42,303 for repairs and maintenance of his personal yacht. I disagree with the majority's conclusion concerning the buildings on the batture and would hold that although Williams did breach his fiduciary duty on that transaction, the plaintiffs are not entitled to any recovery because the action proved beneficial to the corporation. I concur in the majority's conclusion that the case must be remanded to the trial court for determination of the value of the fringe benefits, which the defendants must reimburse to the company.
Before SCHOTT, C.J., and BARRY, ARMSTRONG, PLOTKIN and BECKER, JJ.

DECREE ON REHEARING
PER CURIAM.
In the original opinion there was no split among the three judges with respect to any reversal or amendment of certain aspects of the judgment of the trial court. There was a split as to the affirmation of certain parts of the judgment. However, in response to plaintiff's application for rehearing, one of the judges in the majority voting to affirm the trial court on several issues, joined the dissenting judge who would have reversed the trial court on these issues. Therefore, a rehearing was granted and two additional judges were added to the panel to form a five judge panel and to insure compliance with Art. 5 § 8(B) of the Constitution of 1974.
The rehearing focused on six issues as to which the majority of the original panel *76 was inclined to reverse the trial court. Although the following decree resolves these issues in accordance with the majority vote of the five judge panel, the same judges do not necessarily concur as to each separate issue. By a separate opinion of each judge concurring in or dissenting from certain aspects of the decree together with this decree itself the full opinion of the Court is hereby rendered.[1]
Accordingly, the judgment of the district court relative to the Cathay oil separators is reversed and there is judgment in favor of Algiers Iron Works and Dry Dock Co., Inc., and against Thomas Sewell Williams in the sum of $20,000 with legal interest from the date of judicial demand.
The judgment of the district court relative to the Tower crane transactions is reversed. There is judgment in favor of Algiers Iron Works and Dry Dock Co., Inc. and against Thomas Sewell Williams in the sum of $110,000 with legal interest from date of judicial demand until paid. Plaintiffs' claim for a determination of the value of the services rendered by Algiers Iron Works and Dry Dock Co., Inc., to Tower and for entry of an additional judgment in favor of Algiers Iron Works and Dry Dock Co., Inc., and against Thomas Sewell Williams, Edgar A. Williams, Elmer P. Grundmeyer, Jr., D.D.S., and Mrs. Flora Belle B. Grundmeyer, jointly and in solido is remanded to the trial court.
The judgment of the district court in favor of Thomas Sewell Williams, Mrs. Patricia Williams, Edgar A. Williams, Elmer P. Grundmeyer, Jr., D.D.S., Mrs. Flora Belle B. Grundmeyer, Ronald Isaac, Perrin Rittiner and Ernest Danjean relative to their personal charges and fringe benefits which were paid by Algiers Iron Works and Dry Dock Co., Inc. is reversed. Plaintiffs' claims for a determination of the value of the personal charges/fringe benefits as discussed in the Court's original opinion, and for entry of an appropriate judgment in favor of Algiers Iron Works and Dry Dock Co., is remanded to the trial court.
In all other respects the judgment of the district court is affirmed.
All costs are taxed against the defendants.
REVERSED IN PART; AFFIRMED IN PART; REMANDED IN PART.
SCHOTT, Chief Judge, joined by BECKER, Judge, concurring in the decree.
We concur in the decree for the reasons assigned by Judge Barry in his original opinion except with respect to 1) those items which were unanimously agreed upon by the original panel and were therefore not submitted to the five judge panel for reargument on which we take no position; and 2) Judge Barry's disposition of the profits made by Tower Crane Company on the sale of the two cranes to AIW and on Tower's resale of the Linden Crane. As to this item in the decree, we concur for the reasons assigned by Judge Plotkin in his original dissenting opinion.
BARRY, Judge, dissents in part with written reasons.
The decree conforms to the original majority opinion except as to the tower cranes. My dissent concerns the purchase of the tower cranes. The facts, accepted by a majority of the Court, are detailed in my original opinion.
The two crane purchases by Williams (as President of AIW) from his company (Tower) were not authorized by AIW's Board, hence, both purchases fail the test of La. R.S. 12:84(A)(1), (2) and (3). However, the record supports the trial court's conclusion that the costs of both crane purchases were reasonable and their utility fit AIW's needs. There is no basis to conclude that the cost of either crane was inflated. Despite Williams' breach of his fiduciary duty, the trial court decided that he acted in good faith and did not benefit from the transactions. On a de novo review I might question these issues, however, the record is insufficient to find manifest error.
*77 The majority's position is inconsistent. While the court finds liability for the profit on the oil separator transaction, the majority finds liability for the entire purchase price of the tower cranes plus the alleged profit.
The majority presumably takes this course since, unlike in the oil separator transaction, the tower cranes were not purchased for simultaneous resale to AIW. Williams (through Cathay) was unquestionably making a profit at the expense of AIW in the oil separator transaction.
By contrast, the question of whether a profit was made at the expense of AIW (and if so, how much) is a factual issue as regards the tower crane transactions.
There is no basis to compute damages differently.
PLOTKIN, Judge, dissenting in part and concurring in part.
On the issue of the yacht, Patty Jean, I dissent in the majority's conclusion affirming the trial court's judgment that Williams breached no fiduciary duties and that the use of the Patty Jean by AIW in exchange for repairs, maintenance and refurbishing was reasonable and carried out in good faith. For the reasons stated in my original dissent, I would require Williams to reimburse the company $42,303 for the repairs and maintenance of his personal yacht.
On the issue of the Cathay oil separators, I concur with the majority's decision awarding plaintiffs $20,000 against Thomas Sewell Williams, but for the reasons stated in my dissent to the original opinion.
On the issue of the Tower Crane, I fully concur in the majority's decision reversing the original decision of this court and entering judgment in favor of AIW and against Williams in the sum of $110,000.
On the issue of unearned compensation, I concur with the majority's decision to remand the case to determine the value of the personal charges and fringe benefits received by the defendants and for entry of an appropriate judgment in favor of AIW.
On the issue of the buildings of the batture, I concur in the majority's conclusion that the plaintiffs are not entitled to recover because the transaction proved beneficial to the company. However, for the reasons stated in my original dissent, I would find that Williams did breach his fiduciary duties to the corporation in deciding to build those buildings.
On the issue of Dunbar's termination, I concur in the majority's conclusion that Dunbar has no cause of action under Louisiana law to challenge that action; however, for the reasons stated in my original dissent, I question the appropriateness of that conclusion under the factual circumstances of this case.

ON SECOND REHEARING
The second rehearing was granted solely with respect to the Tower Crane transaction.
First, it is claimed that AIW is entitled to damages because a tower crane was not suitable for AIW's needs and required AIW to expend sums to mount it on a barge and because its capacity was insufficient. The record supports the factfinder's conclusion that at the time these decisions were made, they represented good business judgment and improved the yard's efficiency and productivity. We do not find merit in the contention damages should be awarded.
Second, AIW was awarded $110,000.00 which represents the entire purchase price plus the profit realized by Tower Crane on the sale of the trade-in (Linden) crane.
That measure of damages is inconsistent with the award as a result of the Cathy oil separators transaction where the award was the amount of the profit to Cathay.
Tower made a $15,000 profit on the resale of the Linden crane and that is the appropriate measure of damage.
Our May 9, 1989 degree regarding the Tower Crane transaction is amended from:
There is judgment in favor of Algiers Iron Works and Dry Dock Co., Inc. and against Thomas Sewell Williams in the *78 sum of $110,000 with legal interest from date of judicial demand until paid.
to:
There is judgment in favor of Algiers Iron Works and Dry Dock Co., Inc. and against Thomas Sewell Williams in the sum of $15,000 with legal interest from date of judicial demand until paid.
In all other respects the May 9, 1989 judgment remains the same.
AMENDED.
BARRY, J., dissenting with written reasons.
PLOTKIN, J., dissenting in part and concurring in part, with written reasons.
BARRY, Judge, dissenting.
As stated in my original opinion and in my dissent on First Rehearing, the costs of the cranes were reasonable and their utility clearly fit AIW's needs.
I firmly believe the trial judge's conclusion that no damages should be awarded is supported by the record and should not be disturbed.
PLOTKIN, Judge, dissenting in part and concurring in part, with written reasons:
I agree with the majority's conclusion that the AIW is only entitled to recover only $15,000 on the Tower crane transaction, not the $110,000 awarded in the first rehearing. However, my reasons for coming to this conclusion are different from those advanced by the majority. Additionally, I would have granted rehearing on the oil separator issue. I believe that the measure of the damages for both issues was improper and that both must be amended in order to make the damages consistent on both items. I believe that the proper measure of the damages is the amount of damages suffered by AIW on each transaction, not the amount of profit gained by the culpable parties, as the majority finds. The liability of Tower cranes is the same under both measures, but Cathay's liability is different.
On first rehearing, the majority concluded that both the contract between AIW and Cathay for the oil separators and the contract between AIW and Tower Cranes for the cranes were null and void because they were improper, unauthorized interested director transactions. La.C.C. art. 2033 provides, in pertinent part, as follows:
An absolutely null contract, or a relatively null contract that has been declared null by the court, is deemed never to have existed. The parties must be restored to the situation that existed before the contract was made. If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages.
Under the facts of the instant case, it is obviously impossible or, at least impracticable, to restore the parties to the situation that existed before the contracts were entered. Therefore, this court must decide how best to measure the damages caused by the improper transactions. On first rehearing, we measured the damages as the amount of profit gained by Cathay on the oil separators and awarded AIW $20,000 against Cathay. However, on the crane transaction, we inconsistently measured the damages as the total monies lost by AIW on the transaction and awarded AIW $110,000 against Tower Cranes.
Therefore, on second motions for rehearing from both parties, we were asked to make the recovery consistent between the two issues. After considering the effects of both, I believe the more appropriate measure would be to award AIW its losses on both transactions, rather than the profits gained by Tower and Cathay, as the majority measured the damages. The basis of this conclusion is my belief that the more culpable party should bear the losses suffered on the transactions. Therefore, AIW should be restored as closely as possible to the position it occupied prior to the transactions.
Therefore, on the Cathay oil separator transactions, I believe that AIW should recover its entire $210,000 loss. AIW paid $220,000 for the ten oil separators and sold them several months later for only $10,000. *79 Although I am aware that AIW gained some tax benefits because of the transactions, I do not feel that Cathay should now be allowed to reap those benefits. I would amend our original decree on rehearing to award AIW its entire $210,000 loss against Cathay on the oil separator transaction.
Concerning the cranes, the $15,000 awarded by the majority as the profit gained by Tower is the same amount that AIW lost on the transaction. The record indicates that it is impossible for the cranes to be returned to AIW, therefore AIW is not entitled to return of the purchase price. Therefore, AIW's only loss on the transaction was the $15,000 difference between the estimated $10,000 value of the trade-in crane and the $25,000 Tower received when it sold that crane. I therefore agree with the majority's decision to amend our original decree to limit AIW's recovery from Tower to $15,000.
NOTES
[1] Though other benefits were challenged in the lower court, they have not been raised on appeal and are deemed abandoned.
[1] Dunbar and the other minority directors claim they were unaware of Williams' interest in Cathay.
[2] The value of these expenses was estimated at trial to be as much as $157,500 or as little as $43,303.
[1] Judges Barry and Plotkin dissent in part with written reasons. Chief Judge Schott and Judge Becker concur in the decree with written reasons.